686 P.2d 1301

**Mitch DeGROOT, Plaintiff-Appellee,**

v.

**The ARIZONA RACING COMMISSION, Defendant-Appellant.**

**1 CA–CIV 6121.**

Court of Appeals of Arizona, Division 1, Department D.

July 31, 1984.

334

Tucker & Jessen by G. Michael Jessen and James E. Vieh, Phoenix, for plaintiff-appellee.

Robert K. Corbin, Atty. Gen. by Evelyn R. Epstein, Asst. Atty. Gen., Phoenix, for defendant-appellant.

## OPINION

HAIRE, Presiding Judge.

This appeal involves a decision entered by the Arizona Racing Commission suspending the owner-trainer racing license of appellee Mitch DeGroot for a period of two years and imposing a fine against him in the amount of $2,000. The suspension was based upon the Commission's finding that the presence of a drug, "Nalbuphine" had been detected in a urine sample taken from DeGroot's horse, Bingo Arrive, after a race at Prescott Downs. Pursuant to A.R.S. § 12–901, et seq., DeGroot appealed the Commission's decision to the Maricopa County Superior Court. After reviewing the record, the superior court entered judgment reversing the Commission's decision. The Commission has appealed to this court requesting that its decision be reinstated.

On appeal the Commission contends that its decision was based upon substantial, reliable and probative evidence, that the trial judge erroneously substituted his judgment for that of the Commission in resolving factual conflicts, and that the trial judge also erred in his resolution of various legal issues relating to the interpretation of the Commission's regulations. We agree and reverse the judgment entered in the superior court.

The background facts, stated in a light most favorable to the Commission's decision, are as follows. In the Fall of 1980, based upon reports by its investigators, the Commission became concerned that drugs had been and were being used on various animals and that Valley Racing Laboratory, the laboratory which customarily tested urine specimens for the Commission, was not detecting the presence of prohibited drugs in the specimens. Consequently, a decision was made to "split" certain urine samples and to send one part of the sample to Valley Racing Laboratory, and the other part to a laboratory in Denver, Industrial Laboratories Company. This procedure was followed on races conducted at Prescott Downs on September 1, 1980, and included appellee DeGroot's horse, Bingo Ar-

rive, which finished first in the third race on that date.

On the portion of the specimen taken from Bingo Arrive which was submitted to Valley Racing Laboratory, the report came back negative, with no prohibited drugs detected. On the portion of the specimen submitted to Industrial Laboratories Company, the report revealed the presence of Nalbuphine, a powerful analgesic of a potency equivalent to that of morphine. After detecting the presence of Nalbuphine, Dr. Francis Ozog, Chief of the Racing Chemistry Division of Industrial Laboratories Company, requested that Dr. George Maylin, Chief of the New York Racing and Wagering Board Drug Testing and Research Program at Cornell University, perform an independent chemical analysis of the urine specimen from Bingo Arrive. Dr. Maylin performed the requested analysis and also concluded that the specimen contained Nalbuphine.

At the Commission hearing evidence was presented that Industrial Laboratories Company tested each urine specimen separately. On the other hand, Valley Racing Laboratory "composited" or poured together specimens from six different racehorses for the initial testing. John Long, the owner of Valley Racing Laboratory, acknowledged that the compositing procedure would tend to dilute the particular specimen, and that this would explain his laboratory's failure to detect the Nalbuphine in the Bingo Arrive specimen. Mr. Long stated that the Denver laboratory tests would have six times the sensitivity that his tests had. After being advised of the procedures followed by Dr. Ozog of Industrial Laboratories Company and Dr. Maylin of Cornell, Mr. Long changed his procedures and at the time of the hearing was no longer compositing specimens for testing.

After considering all the evidence, the Commission found that owner-trainer De-Groot had violated the Commission's regulation concerning a trainer's duty to protect the racehorses for which he is responsible from the administration of prohibited drugs, and imposed the penalties previously set forth in this opinion. *See* A.C.R.R. R4–27–107(A), R4–27–107(D) and R4–27–208(A).[1]

Although the judgment entered in the superior court did not indicate the basis for the court's reversal of the Commission's decision, the trial judge's reasoning is set forth in a detailed minute entry order. These reasons can be categorized as follows:

(1) The Racing Commission violated its regulation A.C.R.R. R4–27–107(R) by:

(a) Splitting the urine specimen taken from Bingo Arrive, and

(b) Transmitting the split specimen to a non-official out of state testing company.

(2) There were serious conflicts in the evidence concerning the integrity of the urine specimens taken at the Prescott race, the sample taken from Bingo Arrive, the number of samples taken from all racehorses, and the number of samples received by the Denver laboratory from the Commission.

(3) The state violated DeGroot's right to due process of law when the urine specimen transmitted to the Valley Racing Laboratory and found negative was thereafter destroyed by the Valley Racing Laboratory prior to the hearing.

(4) That DeGroot was denied fundamental due process of law because of the Commission's failure to approach the issues with impartiality and objectivity.

■ We consider first the trial judge's reasoning concerning the alleged "serious conflicts" in the testimony presented before the Commission. Preliminarily we note that the superior court review of the Commission's decision was pursuant to Arizona's Administrative Review Act, and was based on the record made before the Commission. *See generally* §§ 38.79 and 32.3.-9, Vol. 3, Arizona Appellate Handbook. When review of an agency's decision under the Administrative Review Act is on the record, the trial court may not re-weigh the

---

1. All references in this opinion to Commission regulations are to those regulations which were in effect prior to the Commission's 1983 revision.

evidence in order to resolve perceived conflicts. Rather, in order to reverse the agency's decision, the trial court must find that there was no substantial evidence to support the agency decision. *See, e.g., Schade v. Arizona State Retirement System*, 109 Ariz. 396, 510 P.2d 42 (1973). As we have stated in *Webster v. State Board of Regents*, 123 Ariz. 363, 599 P.2d 816 (App.1979):

"The trial judge may not merely substitute his judgment for that of the administrative agency involved. Instead, before a reversal is justified, the trial court must find that the agency has acted arbitrarily, capriciously, or has abused its discretion. *See Arizona Department of Economic Security v. Lidback*, 26 Ariz. App. 143, 546 P.2d 1152 (1976). In the resolution of factual issues, this standard requires a determination of whether there was substantial evidence to support the agency's decision. If two inconsistent factual conclusions could be supported by the record, then there is substantial evidence to support an administrative decision that elects either conclusion. *Sundown Imports v. Arizona Department of Transportation*, 115 Ariz. 428, 565 P.2d 1289 (App.1977)." 123 Ariz. at 365–66, 599 P.2d 818–19 (footnote omitted).

*See also J.W. Hancock Enterprises, Inc. v. Registrar of Contractors*, 126 Ariz. 511, 617 P.2d 19 (1980). A trial court may not function as a "super agency" and substitute its own judgment for that of the agency where factual questions and agency expertise are involved. *Arizona Board of Regents v. Superior Court*, 106 Ariz. 430, 477 P.2d 520 (1970).

It is apparent from the record that the trial court in reviewing the Commission's decision in this matter violated the above-stated fundamental standards governing review of agency decisions under our Administrative Review Act. More importantly, however, our review of the record convinces us that the trial judge's characterization of the record as containing "serious conflicts" concerning various evidentiary aspects highly overstates the minor conflicts which do exist in the record. When the smokescreen created by strong appellate advocacy is put aside and the evidentiary record is objectively evaluated, it is apparent that the weight of the evidence supports the Commission, and not the trial judge, on all aspects of the case concerning which the trial judge voiced "serious questions" or found "serious conflicts."

█ It is true that some conflict in the record was created by the testimony of witness Joe Woods concerning the splitting of the urine sample from Bingo Arrive. Mr. Woods had claimed Bingo Arrive in the race and took the horse from the paddock to the test barn. However, when the testimony of Woods is considered in its entirety, a trier of fact readily could have concluded that Woods was not particularly attentive and that a splitting of the sample could have occurred without his noticing it. This is especially true when consideration is given to the direct, positive testimony of witnesses Guia and Horstman, who testified in detail concerning the taking of the specimen from Bingo Arrive, the immediate splitting of the specimen into two containers, and the immediate sealing of both containers.

█ The trial judge further notes a serious conflict concerning "the number of samples received by the Denver laboratory from law enforcement officials." The record does not reveal any conflict in that regard. Both oral and documentary evidence shows that 16 clearly identified specimens from the September 1, 1980 race were received in the Denver shipment and that a portion of the specimen from Bingo Arrive was included in that shipment. Perhaps the trial judge's confusion arises from appellee's arguments concerning the testimony of witness Burdick. For example, in appellee's answering brief it is urged that "[t]he documentary evidence before the A.R.C. demonstrated that the Denver laboratory received four more samples of equine urine *than Mr. Burdick sent to Denver.*" (Emphasis added). However, the record reveals that Mr. Burdick did not purport to ship or send any samples to the Denver laboratory. His testimony was

that he delivered 12 samples to agent Haw of the Department of Public Safety. From evidence in the record a trier of fact could readily conclude that Burdick was mistaken as to the exact number of containers delivered or that additional specimens were otherwise delivered to agent Haw. Witness Denneny had previously testified that samples were taken not only from the winners of the 12 races, but also from additional horses randomly selected. In any event, it was agent Haw who thereafter made the shipments to the Denver laboratory. Although agent Haw testified that he received a stack of identifying cards from Burdick, with one card identifying each individual container, he was never questioned as to the total number of cards or containers received by him. Moreover, it is clear from his testimony that he shipped a total of 32 containers to the Denver laboratory in three cartons, and that these three cartons were received by the Denver laboratory, containing 16 specimens for races held on August 31, 1980 and 16 specimens for races held on September 1, 1980. We also note that it is uncontroverted that 16 similarly identified split specimens were received and tested by the Valley Racing Laboratory for the September 1, 1980 race. Under these circumstances, forgetting for the moment that it is the Commission's function to resolve conflicts in the record, whatever conflicts might have been raised by witness Burdick's testimony cannot be considered to be substantial. In any event, there is absolutely no conflict, and agent Haw's testimony is very specific that the Bingo Arrive specimen was delivered to him by Burdick and thereafter shipped by him to the Denver laboratory, where it arrived with its seal intact. The fact that additional samples were also received and tested by the Denver laboratory is irrelevant.

In summary on this issue, we find no substantial basis in the record for the trial judge's concerns relating to the "serious conflicts" or "serious questions" concerning the record relating to the integrity of the specimens involved in this case. The evidence established a rigorous chain-of-custody, and the weight of the evidence was overwhelmingly in support of the Commission's resolution of these issues.

We next consider the contention that the testing results from the Denver laboratory should have been excluded because, in the trial court's opinion, the Commission violated its regulation R4–27–107(R) by splitting the samples and by transmitting the split sample to a "non-official" out-of-state testing company. In this connection, the trial judge stated that the Commission was implementing new procedures which directly contradicted or significantly varied its own established rules.

A.C.R.R. R4–27–107(R) provides as follows:

"R. Samples of saliva, urine or any other test substance shall be taken by persons appointed by the Arizona Racing Commission, under the supervision of the Commission veterinarian. *During the taking and sealing of such tests the owner, or trainer,* or their authorized agent may be present at all times. The sample *shall be immediately sealed in a container* and the evidence of such procedure witnessed by the signature of the owner, or trainer, or their representative. *The sample shall thereupon be forwarded with dispatch to the Official Racing Commission Laboratory* for chemical analysis and report to the Arizona Racing Commission. No person shall interfere in any manner with the testing procedures conducted under this Rule." (Emphasis added).

It is our opinion that the procedures adopted by the Racing Commission relating to the splitting of urine samples and transmitting the split samples to a "non-official" additional laboratory for testing did not vary from the requirements of its regulation R4–27–107(R) to an extent which would require or justify the exclusion of the report received from the Denver laboratory.

Concerning the splitting of the sample, the contention appears to be that if the sample was split into two containers and each container then sealed, the specimen was not "immediately sealed in *a* con-

tainer." (Emphasis added). The evidence reveals that the splitting of the sample occurred immediately after the sample was caught and that the two containers were then immediately sealed. Therefore, there can be no argument raised concerning the time constraints of the regulation. The contention that the regulation was violated because, in addition to being immediately sealed in "a container," a portion was also sealed in another container is hairsplitting at best. Actually the regulation was fully complied with when a portion of the sample was sealed in "a container." The fact that additional procedures were undertaken over and beyond the requirements imposed by the regulation does not justify a conclusion that the regulation itself was not complied with. The foregoing analysis is equally applicable to appellee's contention that the regulation was violated because the Commission had additional investigators present for the purpose of witnessing the urine specimen procedure. The regulation simply does not preclude the presence of additional witnesses.

■ We next consider the contention that the regulation was violated because a portion of the specimen was sent to a "non-official" laboratory for testing. Extensive argument was presented before the Commission, in the trial court, and in the briefs on appeal in this court as to whether the Valley Racing Laboratory was the one and only official racing commission laboratory within the meaning of the Commission's regulation, or whether the Denver laboratory could also qualify as an official laboratory under the arrangements made with the Denver laboratory by the Commission for these tests. We find it unnecessary to decide the "official laboratory" issue. If we assume, as urged by appellee, and as apparently found by the trial court, that the Valley Racing Laboratory was the one and only official laboratory, there was still no violation of the regulation since the specimen was in fact sent to Valley Racing Laboratory for a chemical analysis and report as required by the regulation.

There is nothing in the regulation which purports to limit laboratory reports or any other proof of drug violations to the report which might be received from the "official" laboratory. The regulation itself does not purport to be exclusive in that regard. In *Martinez v. State Racing Commission,* 10 Mass.App. 909, 410 N.E.2d 740 (1980), the issue presented concerned whether the Massachusetts racing commission could consider the results of urine tests conducted by a laboratory other than the specific or official laboratory designated in a regulation adopted by the Commission. The Commission held that the test results constituted "substantial evidence" within the pertinent statutory requirements, and therefore the test results were considered by the Commission in arriving at its decision to suspend certain horsetrainers. As in this case, the Massachusetts Superior Court reversed the Commission's decision. On appeal, however, the appellate court noted that nothing in the Commission's regulation purported to preclude the consideration of reports from other laboratories, and, agreeing with the Commission that such reports constituted substantial evidence, the court reinstated the Commission's decision. Similarly here, we agree with the Commission that the regulation does not purport to preclude evidence of test results from other laboratories, that such evidence is substantial evidence as required in agency hearings by A.R.S. § 41–1010, and that the Commission did not commit error in considering the test results from the Denver laboratory in arriving at its decision to suspend appellee DeGroot. Given the fact that there was ample evidence presented explaining the reason for the failure of the Valley Racing Laboratory test to discern the presence of the drug, the Commission did not abuse its discretion in relying upon the Denver laboratory report rather than the Valley Racing Laboratory report in this case.

■ We conclude our discussion on this issue by noting that our R4–27–107(R) is a regulation creating an internal agency procedure for the orderly collection and testing of urine or blood specimens in order that the Commission might enforce the prohibition against the use of drugs in state-regulated racing meets. Such a rule does

not create vested procedural rights which may be relied upon by any person for the purpose of excluding evidence which is otherwise of a competent and probative nature. *See United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).

The trial judge was also of the opinion that reversal of the Commission's decision was required because, after testing the composited urine sample and finding the composited sample negative, the Valley Racing Laboratory then disposed of the samples. The trial judge's reasoning in this regard was based upon the due process principles set forth in *Scales v. City Court of the City of Mesa,* 122 Ariz. 231, 594 P.2d 97 (1979). Although the due process underpinnings of *Scales* have been substantially, if not entirely, eroded by the recent decision of the United States Supreme Court in *California v. Trombetta,* —— U.S ——, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and, although we have substantial doubts that the *Scales* due process principles would have justified reversal when applied to the facts of this case, we find that appellee failed to timely raise this due process issue before the Commission and that the trial court should not have addressed this issue on its merits. Our conclusion that the issue was not timely raised before the Commission is based upon the following. On September 7, 1980, appellee De-Groot was given written notice of his initial suspension in this matter. That written notice expressly set forth that the suspension was based upon a report from Industrial Laboratories in Denver which found a prohibited drug in the urine sample of Bingo Arrive, the sample being taken at Prescott Downs on September 1, 1980. The Commission hearing did not take place until October 24, 1980, some 47 days after the written notice. Although appellee now urges that it was extremely important to his defense that he be given the opportunity to exonerate himself by having independent laboratory testing of the specimen, during this entire interim period he made

no request or attempt to obtain the samples from either laboratory for retesting. In the subpoena *duces tecum* for John Long, which appellee requested prior to the Commission hearing, appellee specified in detail that reports concerning the Valley Racing Laboratory's tests on the Bingo Arrive specimen and other documentary evidence be produced. However, he failed to specify or require that any remaining urine specimen be produced.

At the evidentiary hearing on October 24, 1980, the testimony revealed that although Industrial Laboratories of Denver had retained a portion of the Bingo Arrive specimen, the Valley Racing Laboratory had disposed of its portion of the specimen after its testing of the composited sample had not revealed the presence of any prohibited drugs. After the disclosure of the foregoing at the evidentiary hearing, appellee still did not make any request that he be allowed to arrange for re-testing of the Bingo Arrive urine specimen or object or argue in any way that he had been deprived of due process by reason of the disposal of the Valley Racing Laboratory's portion of the Bingo Arrive specimen.

Some two weeks after the conclusion of the evidentiary hearing at which appellee was to have presented all of his evidence, his counsel apparently advised opposing counsel that he wished to examine the remaining Valley Racing Laboratory unused portion of Bingo Arrive's urine specimen.[2] Of course, the request at that late date could be made in absolute safety, since it had already been established at the trial that this portion of the sample had been disposed of and was therefore not available for examination. However, even at that late date appellee did not present any argument or contention to the Commission that the disposal of that portion of the sample had violated his due process rights under *Scales* or otherwise.

On November 24, 1980, one month after the evidentiary trial of this matter, but

---

2. The Commission record does not reveal any formal request of this nature or that the request was ever presented to the Commission. However, a letter attached to a pleading filed in the superior court does indicate that such a request was made to counsel.

before the Commission issued its decision, appellee filed a petition for preliminary injunction in the superior court, seeking to enjoin further proceedings by the Commission in this matter. In support of the petition, appellee argued that he had been denied due process of law by the Commission, urging the "official laboratory" arguments previously discussed in this opinion and also an alleged conflict on behalf of the attorney general in representing the Commission and at the same time acting as the prosecutor in this matter. Again, there was no contention that appellee's due process rights had been violated by reason of the disposal of the Valley Racing Laboratory portion of the Bingo Arrive sample.[3] Thereafter, on December 8, 1980, appellee filed with the Commission his requested findings of fact and conclusions of law together with a memorandum of points and authorities. Appellee had previously been advised by the Commission that it would afford him the opportunity to submit a memorandum of law setting forth any argument that he desired to raise. He did not request any findings or conclusions concerning a purported denial of his due process rights by reason of the disposal of the Valley Racing Laboratory portion of the sample, nor was any argument made in that regard in his memorandum of points and authorities.

On January 27, 1981, the Commission entered its "Memorandum, Findings of Fact and Conclusions of Law" which constituted the basis for its decision in this matter. Since no due process contentions had been raised by appellee relating to the disposal of the Valley Racing Laboratory portion of the Bingo Arrive sample, these findings and conclusions did not address or discuss that issue. On February 2, 1981, appellee filed his motion for rehearing before the Commission. Again, appellee did not present any argument that the Commission's decision should be set aside because of due process violations concerning

the disposal of the Valley Racing Laboratory portion of the Bingo Arrive specimen.[4]

In view of the trial judge's ruling that this issue required reversal, we have gone into some detail in our examination of the record to show that the Commission record fully supports the Commission's contention that this issue was not timely raised and that its alleged impact on appellee's due process rights was not perceived by appellee himself to be of any great importance until after the filing of appellee's complaint in the superior court seeking review of the Commission's decision. In a motion for stay order filed in the superior court with his complaint, appellee for the first time urged that the disposal of the Valley Racing Laboratory portion of the Bingo Arrive specimen violated his due process rights and required that the Commission action taken against him be dropped. The general rule is that failure to raise an issue before an administrative tribunal precludes judicial review of that issue on appeal unless the issue is jurisdictional in nature. *Calixto v. Industrial Commission*, 126 Ariz. 400, 616 P.2d 75 (App.1980); *Stephens v. Industrial Commission*, 114 Ariz. 92, 559 P.2d 212 (App.1977). We agree with the Commission's contention that the issue was not timely raised and therefore may not be urged as a basis for reversal.

Proceeding now to the next issue raised by the trial judge in his minute entry order, we note that he expressed concerns relating to whether the Commission approached its duties in this hearing with the objectivity and impartiality essential to the appropriate performance of its quasi-judicial function. These comments by the trial judge were apparently prompted by appellee's arguments relating to a statement allegedly made by one of the commissioners to witness Long prior to the hearing. The statement was to the effect

---

**3.** This petition for preliminary injunction was denied by the trial court.

**4.** In the "Conclusion" portion of appellee's motion for rehearing he does for the first time mention in a factual manner that "thereafter the sample was destroyed. It cannot be examined again by the Commission."

that the Commission was unhappy because Long (owner of the Valley Racing Laboratory) "had missed a positive."[5] We have examined in detail the transcript of the Commission hearing and other parts of the record relating to these proceedings, and we find no substantial indication that appellee has been denied due process because of any improper approach or pre-judgment by the members of the Commission in this case. Of course in any agency proceeding in which the agency occupies a dual investigative and adjudicative capacity, it will be necessary for the agency to receive the results of investigations, to make preliminary decisions or approve the filing of formal charges, and then to participate in the resulting hearings. This type of procedure does not violate due process of law. *See Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *In re Davis*, 129 Ariz. 1, 628 P.2d 38 (1981).

In the past this court has not hesitated to severely criticize and condemn the Arizona Racing Commission for hearing procedures and conduct which we deemed improper and of a nature impinging upon a party's due process right to a fair hearing. *See Arizona Downs v. Turf Paradise, Inc.*, 682 P.2d 443 (Ariz.App.1984). The record presented in this matter does not merit such criticism. In addition to the reasons set forth in the trial judge's minute entry order, appellee has raised other contentions in support of the trial judge's reversal of the Commission's decision. Since in general we find these contentions to be without merit, we will not further lengthen this opinion with a detailed discussion and analysis of each contention, but will dispose of each in a summary fashion.

■ We first note that the Commission's failure to vote in open meeting to have certain urine specimens analyzed by the Denver laboratory did not constitute a violation of Arizona's open meeting law (A.R.S. § 38–431, et seq.). We agree with the Commission that the day-to-day ministerial operations of the Commission in its enforcement activities may appropriately be delegated to its executive secretary. In any event, while a violation of the open meeting law might have operated to invalidate any contract entered into between the Commission and the Denver laboratory, such a violation would not justify the exclusion of any resulting substantial and reliable evidence tending to prove a violation of the Commission's regulations relating to the use of prohibited drugs.

■ We also reject appellee's contention that there was no evidence to support a finding that Nalbuphine was a prohibited substance. A.C.R.R. R4–27–107(F) includes among prohibited substances "any drug, medicine or other substance foreign to the horse's or greyhound's body which does or could affect the racing condition of a horse or greyhound ... [t]hese foreign substances include but are not limited to stimulants, depressants, local anesthetics, narcotics and *analgesics*." (Emphasis added). Exhibit 18 in evidence defines Nalbuphine as a powerful analgesic of a potency equivalent to that of morphine. From this evidence alone the Commission in the application of agency expertise could have found that Nalbuphine was a prohibited drug, particularly in the absence of any contention to the contrary.

■ We further note that there was no necessity that evidence be presented or that it be proven that appellee DeGroot administered the drug. Under A.C.R.R. R4–27–107(D), a trainer is required "to protect and guard the horse or greyhound against the administration, either internally or externally, of any prohibited drug." A.C.R.R. R4–27–208(A) provides:

"The trainers are responsible for the condition of horses under their care and are required to protect such horses from acts of other parties."

---

5. We do not find persuasive appellee's arguments that such alleged statement and the scheduling of a hearing relating to Valley Rac-

ing Laboratory's general testing performance constituted an attempt by the Commission to intimidate witness Long.

These types of rules are known as trainer-responsibility rules and are generally interpreted as imposing strict liability upon the trainer as a condition for the holding of his license. He is made strictly responsible for the condition of the horse, even though the prohibited drug might be administered without his knowledge. Rules of this nature have been repeatedly upheld against due process and other attacks as a reasonable exercise of the state's authority to enforce its laws relating to horseracing. *See, e.g., Division of Pari-Mutuel Wagering, Department of Business Regulation v. Caple*, 362 So.2d 1350 (Fla.1978); *Sandstrom v. California Horseracing Board*, 31 Cal.2d 401, 189 P.2d 17, *cert. denied*, 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369 (1948).

Appellee has urged that the fine of $2,000 imposed upon him was in excess of the Commission's authority under the charges involved, and that the statutory maximum is $500. Although this issue was contested by the Commission in its briefs filed in this court, at oral argument counsel for the Commission confessed error on this issue and admitted that the maximum fine allowed is $500.

For the reasons set forth in this opinion the judgment entered in the trial court is reversed. The decision entered by the Commission is reinstated, with the exception that the fine imposed on appellee is reduced to $500.

EUBANK and MEYERSON, JJ., concur.