729 P.2d 960

**Tommy SANDERS, Plaintiff-Appellant,**

**v.**

**Lloyd F. NOVICK, Director of The Department of Health Services, Defendant-Appellee.**

**No. 1 CA–CIV 8799.**

Court of Appeals of Arizona, Division 1, Department C.

Nov. 10, 1986.

---

Greengard & Finley, A Professional Association by Patricia J. Finley, R. Austin, Goodale, Phoenix, for plaintiff-appellant.

Robert K. Corbin, Atty. Gen. by Elizabeth Teply, Asst. Atty. Gen., Phoenix, for defendant-appellee.

## OPINION

SHELLEY, Acting Presiding Judge.

This appeal is from a judgment affirming a decision of the Arizona Department of Health Services (DHS) ordering Ms. Tommy Sanders to cease operation of an unlicensed health care facility. The primary issue on this appeal is whether by virtue of Sanders' co-guardianships over residents in that facility, the facility was exempt from regulation by DHS. We hold that the facility was not exempt and affirm the judgment of the trial court.

During October 1984, Sanders operated a licensed supervisory care facility in Peoria, Arizona. At the same time she also provided care to twelve individuals in an unlicensed home on an adjacent parcel of land. On October 17, 1984, a joint investigative team from DHS and the Arizona Department of Economic Security (DES) entered the unlicensed facility pursuant to a warrant. The purpose of the visit was to assess the level of care needed by the residents of the home.

Participants in the joint DHS/DES investigation concluded that eleven of the twelve persons residing in the unlicensed home required either intermediate or skilled level nursing care as defined by DHS regulations. Many residents were disoriented, incapable of ambulation and incontinent.

On October 18, 1984, DHS issued a cease and desist order directing Sanders to discontinue operating an unlicensed health care institution in violation of the provisions of A.R.S. §§ 36–401, *et seq.* The cease and desist order alleged that Sanders was illegally providing medical and nursing services for patients requiring intermediate or skilled nursing care.

Prior to an administrative hearing on the cease and desist order, Sanders completed the addition of a new wing to her licensed supervisory care facility and relocated residents from the adjacent home to the new wing.

An administrative hearing was conducted during January and February 1985 before a DHS hearing officer. At the hearing, Sanders testified that she had no major quarrel with the DHS conclusions concerning physical and mental assessments of the residents as a result of the October 17, 1984 investigation. She conceded that she knew the residents were not supervisory care level as defined by DHS regulations. She further admitted that she and her staff administered medications, bathed the residents, cared for the special needs of those who were incontinent and used restraints to control a victim of Alzheimer's disease.

Sanders defended her activities on grounds that she had obtained, or was in the process of obtaining, co-guardianships for those residents who required this high level of care. She submitted orders appointing her co-guardian of eight of the residents. These documents specifically provide that Sanders shall not have control or possession of the monies belonging to these individuals and shall not control where the individuals are to live.

Sanders and two relatives of her patients testified that the co-guardianships with Sanders were obtained in order to give the wards the right to live with Sanders without violating the law.

The hearing officer concluded that: (1) Sanders was operating an unlicensed health care institution and caring for persons requiring intermediate and skilled nursing care in violation of A.R.S. §§ 36–407.A, 36–430 and 36–431; and (2) Sanders' co-guardianship letters did not exempt her facility from licensure requirements.

On March 25, 1985, Lloyd F. Novick, Director of DHS, signed a decision adopting the findings of fact, conclusions of law and recommendations of the hearing officer. Sanders' request for a rehearing was denied on May 14, 1985. She then filed an appeal to superior court pursuant to A.R.S. § 12–901 from the DHS order directing her to cease operation and to comply with the terms of the cease and desist order issued on October 18, 1984.

The trial court entered judgment in favor of DHS and Sanders filed a timely notice of appeal to this court.

Pursuant to the Administrative Review Act, A.R.S. § 12–901 to –913, the trial court's review of the findings of fact made by DHS was limited to determining whether DHS acted arbitrarily, capriciously or in abuse of its discretion. *DeGroot v. Arizona Racing Comm'n,* 141 Ariz. 331, 336, 686 P.2d 1301, 1306 (App.1984); *Schmitz v. Arizona State Board of Dental Examiners,* 141 Ariz. 37, 684 P.2d 918 (App.1984). On appeal this court must determine whether the record contains evidence to support the trial court's judgment and in so doing reach the underlying question of whether the administrative agency acted arbitrarily, capriciously, or in abuse of its discretion. *Maricopa County v. Gottsponer,* 150 Ariz. 367, 370, 723 P.2d 716, 719 (App.1986). However, both the trial court and this court are free to draw their own legal conclusions and determine whether an agency erred in its determination of the law. *Arizona Department of Economic Security v. Magma Copper Co.,* 125 Ariz. 23, 607 P.2d 6 (1980); *Eshelman v. Blubaum,* 114 Ariz. 376, 378, 560 P.2d 1283, 1285 (App.1977). We may substitute our judgment for agency conclusions regarding the legal effect of its factual findings. *Gardiner v. Arizona Department of Economic Security,* 127 Ariz. 603, 606, 623 P.2d 33, 36 (App.1980).

The hearing officer's conclusions of law, incorporated by reference in the DHS decision, held that Sanders' coguardianship letters did not exempt her from licensure as they were obtained "primarily for the purpose of circumventing the requirements of licensure" and Sanders did "not possess the requisite powers and duties imposed upon a guardian in order for such guardianship to be determined to be effective to exempt her from licensure ..."

In support of his recommendation, the hearing officer also set forth what he believed to be the nature and effect of the guardianships obtained by Sanders, stating in part:

Under the terms of her appointment, Respondent is unable to choose the place where the ward is to reside, a power inherent in guardianship law. Furthermore, with the exception of providing medical consent for her wards, an examination of the powers and duties of a guardian, militate against Respondent exercising any authority over her purported wards.

Additionally, Respondent has been operating her home on a commercial basis which creates a direct conflict of interest between her mercantile duties to herself

and her fiduciary duties to her purported wards....

Your undersigned does not believe that Respondent's acceptance of Letters of Guardianship provides an ipso facto legitimacy to her actions. Regardless of the court's appointment, Respondent does not perform the duties inherent in a guardian in order to avail herself of the privileges of guardianship. The Department has the inherent power in a hearing of this sort to go behind the four corners of the guardianship papers and examine the true relationship as it exists between guardian and ward and, in appropriate cases, pierce the veil of guardianship. Furthermore, the Department does not have a duty to remove Respondent as co-guardian in order to have its position sustained.

In addition to adopting the hearing officer's decision, DHS also concluded that Sanders was providing a level of care in excess of "health-related services" permitted by the statutory exemption and that these services were received by residents from a hired staff rather than the legal guardian.

There is substantial evidence in the record that: Sanders operated her home on a commercial basis; care was provided by hired staff; care involved administering medicine and dealing with needs of persons having serious infirmities; and that Sanders and relatives of the residents were motivated to obtain the co-guardianship for Sanders in order to permit the residents to live in a home which did not comply with DHS regulations. We must decide as a matter of law whether under these circumstances Sanders' facility was exempt from DHS regulation and control.

A.R.S. § 36–402 sets forth a number of statutory exemptions from the general authority of DHS contained in A.R.S. §§ 36–401 to –447.20. Sanders relies on the exemption of A.R.S. § 36–402.7 which provides:

Nothing in this chapter or the rules or regulations adopted under the provisions of this chapter authorizes the licensure, supervision, regulation or control of:

7. Places wherein persons receive health-related services *only* from relatives or from legal guardians. (Emphasis added)

The essence of the DHS position that this exemption did not apply to Sanders' home is that: (1) Sanders provided services in excess of "health-related services"; (2) services were provided by a hired staff rather than a legal guardian; and (3) Sanders was not a legal guardian within the meaning of the exemption.

■ The parties agree that Sanders and her staff provided care to residents including: assisting them to stand and ambulate, toileting, changing diapers, administering medications, changing catheters, using posey restraints, cooking, serving and cutting up food. DHS contends that these are not "health-related services" and further argues that a legal guardian is limited to providing "personal care," *i.e. assisting* persons in eating, bathing and dressing in a protective environment. *See* A.R.S. § 36–401.A.24.

We find no statutory authority for equating "health-related services" with "personal care services." "Health-related services" are defined in A.R.S. § 36–401.A.15 as "services, other than medical, pertaining to general supervision, protective, preventive and personal care services or supervisory care services." It encompasses more than "personal care services." We must then look to any statutory definitions of other terms falling within this definition. In addition to "personal care services", A.R.S. § 36–401 also defines "supervision" and "supervisory care services."

"Supervision" is defined as "direct overseeing and inspection of the act of accomplishing a function or activity." A.R.S. § 36–401.A.29.

"Supervisory care services" includes providing accommodation and board and general supervision including assisting persons in self-administration of prescribed medications. A.R.S. § 36–401.A.31.

We find no statutory definition of "protective" or "preventive" services.

The only clear exclusions from the definition of "health-related services" are "medical services," which are defined in A.R.S. § 36–401.A.18 as "[T]he services pertaining to medical care that are performed at the direction of a physician on behalf of patients by physicians, dentists, nurses and other professional and technical personnel." The definition of medical services is not particularly helpful in determining whether the activities performed by Sanders and her staff are "medical services" because it does not describe particular tasks. Rather, it refers to the providers of the services. Thus, if Sanders and her staff are not "physicians, dentists, nurses and other professional and technical personnel", they fall outside the definition. There is no evidence that they fall within these categories.

The term "health-related services" is broad in scope. Neither "protective" nor "preventive" services are statutorily defined. We do not address whether there are other statutes that impact on the authority of Sanders and her staff to use posey restraints on Alzheimer's victims, change catheters, and administer medications. However, these activities are not directly proscribed by A.R.S. § 36–407A. Further, they can reasonably be found to constitute "protective" or "preventive" care. Thus, we hold that the provision of these services by a legal guardian does not fall outside the scope of A.R.S. § 36–402.7.

◼ We next consider whether the provision of these services by hired staff rather than directly by Sanders made the exemption provided by A.R.S. § 36–402.7 inapplicable to her home.

The present A.R.S. § 36–402.7 was enacted as § 36–402.5 by Laws 1977, Ch. 172, § 5 as part of House Bill 2319. *See also* Laws 1978, Ch. 62, § 20–21 (repealing the enactment of § 402.5 and reenacting it as § 402.7). The exemption was part of the senate amendment to House Bill 2319. *See* Minutes of the Senate Committee on Health and Welfare, 33rd leg. 1st Reg.

Sess., May 10, 1977. The statute exempts places where health-related services are provided *"only"* by relatives or legal guardians. Sanders argues that if we construe this provision to mean that all such services must be directly provided by the legal guardian, a parade of horrors will result, *e.g.*, an elderly spouse caring for an incapacitated spouse would not be able to hire a cook or housekeeper to assist in his or her care; the parents of an ill child would not be able to hire a babysitter to care for the child. However, assuming arguendo that a duly appointed legal guardian could delegate some ministerial tasks while retaining primary care of the ward, these are not the facts before us.

Sanders obtained numerous co-guardianships through which she attempted to operate a facility without a license. Her staff did not merely assist Sanders to personally care for her wards. Rather, staff rendered most of the required care for the residents of Sanders' home. The evidence reflects that 11 of the 12 residents of the home required intermediate or skilled nursing care around the clock. Under no reasonable interpretation of these facts can it be concluded that Sanders intended to be the primary care giver.

We are of the opinion that by limiting the exemptions to places where health care services are provided *only* by relatives or legal guardians, the legislature did not intend to apply the exemption to places where the basic responsibility for care fell on other persons. We agree with DHS that neither the clear statutory language nor the legislative history reflects an intent to permit the creation of de facto health care institutions through the use of legal guardianships. Given the circumstances of this case, we find that Sanders was not entitled to have her facility exempted from DHS regulation pursuant to A.R.S. § 36–402.7.

◼ It is not necessary to address the DHS contention that Sanders' guardianship orders were insufficient to come within the exemption in order to affirm the trial court

in this case. However, as this issue has the potential for recurrence, we note that in a hearing to determine whether a facility is exempt by virtue of A.R.S. § 36–402.7, it is not the prerogative of DHS to inquire into the efficacy of a probate court order appointing a guardian. There is no authority for an administrative hearing officer to "pierce the guardianship" as set forth in the conclusions of law by the hearing officer. Concerns about the propriety of the guardianship must be directed to the probate court under appropriate procedures. *See, e.g.,* A.R.S. § 14–5307.

The judgment of the trial court is affirmed.

JACOBSON, and KLEINSCHMIDT, JJ., concur.