83 P.3d 1114

**Claude L. WINTERS, Plaintiff–Appellant,**

v.

**ARIZONA BOARD OF EDUCATION, Defendant–Appellee.**

No. 1 CA–CV 03–0147.

Court of Appeals of Arizona, Division 1, Department E.

Feb. 12, 2004.

Skarecky & Holder, P.A., By William W. Holder, Phoenix, Attorneys for Plaintiff–Appellant.

Terry Goddard, Attorney General, By Jennifer A. Pollock, Assistant Attorney General, Phoenix, Attorneys for Defendant–Appellee.

## OPINION

HOAG, Judge.*

¶ 1 In this opinion, we hold that the showing of a nexus, or sufficiently rational connection, between the off-campus actions of a teacher and his/her fitness to teach is required before disciplinary action against the teacher may be taken based on such acts.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 After receiving his master's degree in education, Claude L. Winters began his first teaching job at Buckeye Union High School in 1997 with a temporary secondary teaching certificate issued by the Arizona Board of Education. In August of 2000, the Board initiated disciplinary proceedings to censure, suspend, suspend with conditions, or revoke the teaching certificate. In its complaint, the Board alleged that disciplinary action was warranted in light of Winters' conduct as illustrated by five separate incidents dating from October 1998 to April 2000.

¶ 3 *Incident One:* On October 15, 1998, Winters and his twenty-one-year-old neighbor were arrested following a verbal altercation. Both were cited for disorderly conduct. The citations were later dismissed by the Buckeye Magistrate Court.

¶ 4 *Incident Two:* On May 10, 1999, Winters called the Buckeye Police Department and complained that a rock had been thrown through the front window of his home. Later that same evening, Winters' loaded .357 revolver discharged and damaged a neighbor's air conditioning unit. He was charged with criminal damage and disorderly conduct with a deadly weapon. Under the terms of a plea agreement, he pled no contest to the

* The Honorable M. Jean Hoag, a judge of the Maricopa County Superior Court, was authorized to participate in the disposition of this matter by the Chief Justice of the Arizona Supreme Court pursuant to Article 6, Section 3, of the Arizona Constitution.

unlawful discharge of a firearm, a class 2 misdemeanor, and was sentenced to standard probation for one year.

¶ 5 *Incident Three:* On August 7, 1999, Winters and another neighbor got into a physical altercation in the street outside their homes. Both were charged with disorderly conduct. The charge against Winters was dismissed.

¶ 6 *Incident Four:* The next day, on August 8, 1999, Winters and a former student became engaged in a verbal confrontation at a local convenience store. Winters was charged with threatening and intimidating the eighteen-year-old. Citing "insufficient evidence-mutual argument," the city prosecutor declined to prosecute.

¶ 7 *Incident Five:* On April 21, 2000, Winters was arrested and charged with obstructing a criminal investigation, aggravated harassment, interfering with a judicial proceeding, and threatening and intimidating. The arrest stemmed from a dispute between Winters and a neighboring family. Both Winters and his neighbors had previously obtained protective orders against each other. Winters had violated that order of protection by threatening the neighbors' children. He told the children that they "had better sleep with one eye open." He also told the Buckeye Chief of Police "that if nothing was done about the situation, that something might happen." Winters accepted a plea agreement and pled guilty to aggravated harassment, a class 1 misdemeanor. He was sentenced to supervised probation for one year and ordered to participate in anger-management counseling as a condition of probation.

¶ 8 After being served with the Board's complaint, Winters requested and received a hearing before its Professional Practices Advisory Committee ("PPAC"). At the close of the hearing, the PPAC recommended that the Board revoke Winters' teaching certificate. The Board considered the PPAC's recommendation and heard testimony from Winters and arguments from his attorney at two separate Board meetings. On November 26, 2001, a majority of the Board voted to adopt the PPAC's recommendation and revoke Winters' teaching certificate.

¶ 9 After his motion for reconsideration was denied, Winters sought judicial review of the Board's decision in superior court. The trial court affirmed the Board's decision, finding that it was supported by the evidence and not contrary to law, arbitrary, capricious, or an abuse of discretion. Winters timely appeals. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101(B) (2003).

## DISCUSSION

¶ 10 When reviewing an administrative decision, the trial court determines only whether the administrative action was supported by substantial evidence, and was not illegal, arbitrary, capricious, or an abuse of discretion. *Webb v. State ex rel. Ariz. Bd. of Med. Exam'rs,* 202 Ariz. 555, 557, ¶ 7, 48 P.3d 505, 507 (App.2002). In our review of the trial court's decision, we examine the record to determine whether the evidence supports the judgment. *Id.* Neither the trial court nor this court may substitute its judgment for that of the agency on factual questions or matters involving agency expertise. *DeGroot v. Ariz. Racing Comm'n,* 141 Ariz. 331, 336, 686 P.2d 1301, 1306 (App.1984). However, statutory interpretation, as a question of law, is subject to our de novo review. *See Koller v. Ariz. Dep't of Transp.,* 195 Ariz. 343, 345, ¶ 8, 988 P.2d 128, 130 (App.1999).

### I.

¶ 11 Winters first contends that the revocation was contrary to law because neither the PPAC nor the Board ever found that he had engaged in immoral or unprofessional conduct. A finding of immoral or unprofessional conduct is required before the Board can impose any disciplinary action, including the revocation of a teaching certificate. *See* A.R.S. § 15–203(A)(20) (Supp.2003) ("The state board of education shall ... [i]mpose such disciplinary action, including the issuance of a letter of censure, suspension, suspension with conditions or revocation of a certificate, upon a finding of immoral or unprofessional conduct."). Our review of the record indicates that the

PPAC and the Board found that Winters' conduct was unprofessional.

¶ 12 In its conclusions of law, the PPAC determined that Winters' conduct, including but not limited to the numerous charges of disorderly conduct, threatening and intimidating, criminal damage, and pleading guilty to aggravated harassment, constituted "good and sufficient cause for disciplinary action against any and all certificates held by him pursuant to A.R.S. § 15–203(A)(14) and (20)[.]" Moreover, the chair of the PPAC twice stated at the hearing that there had been a finding of unprofessional conduct.[1] Furthermore, both attorneys before the PPAC noted that the primary issue to be determined was whether Winters' conduct constituted unprofessional conduct. In short, it is clear from the record that the PPAC considered and found Winters' conduct to be unprofessional. The Board adopted the PPAC's findings and conclusions. We thus reject Winters' contention that there was no finding of unprofessional conduct.

## II.

¶ 13 Winters also maintains that the Board acted contrary to law by failing to define the term "immoral or unprofessional conduct" by the December 1, 2001 statutory deadline.[2] We will not address this issue because Winters failed to raise this argument below. Before the trial court, Winters' reference to the statutory deadline was limited to arguing what constitutes a nexus and that the Board was not entitled to deference. In his pleadings, Winters wrote:

1. The chair, in response to another member of the Board, stated, "This is not the recommendations [sic] for sanction, but this is at least a finding that there has been unprofessional conduct which is the essential part of a conclusion of law[.]" Minutes later, after voting, the chair stated, "And we come to the recommended sanction. Having found the findings of fact and reached a conclusion of law that the conduct constitutes unprofessional conduct."

2. The former statute provided that the Board shall "By December 1, 2001, adopt rules to define and provide guidance to schools as to the activities that would constitute immoral and unprofessional conduct of certificated persons." A.R.S. § 15–203(A)(30) (2002). The subsection

Since the Arizona Board of Education has yet to define "unprofessional conduct" despite the legislative mandate that it do so by December 1, 2001, A.R.S. § 15–203(A)(30), this Court should look to two sources of public policy in considering what constitutes a nexus in a[sic] unprofessional conduct case.

. . . .

It is also true ... that the [Court of Appeals in an earlier decision] deferred to the State Board of Education on the definition of "unprofessional." Unfortunately, in the years since [that decision] in 1991, the Board still has not defined "unprofessional conduct" even though the legislature has order it to do so by December 1, 2001. A.R.S. § 15–203(A)(30). The Board is therefore not entitled to the same deference that was afforded it by [the Court of Appeals' earlier decision].

Winters' pleadings do not further the position he now urges.[3] When a challenge is not raised with specificity and addressed in the trial court, we generally do not consider it on appeal. *Westin Tucson Hotel Co. v. Dep't of Revenue*, 188 Ariz. 360, 364, 936 P.2d 183, 187 (App.1997); *Third & Catalina Assocs. v. City of Phoenix*, 182 Ariz. 203, 209, 895 P.2d 115, 121 (App.1994). Accordingly, we find that he waived this argument.

## III.

¶ 14 Next, Winters argues that his conduct did not constitute "unprofessional conduct" because there was no evidence that it affected the operation of any school or that it adversely affected the teacher-student re-

was later amended, under which the Board was to "Adopt rules to define and provide guidance to schools as to the activities that would constitute immoral or unprofessional conduct of certificated persons." A.R.S. § 15–203(A)(30) (Supp. 2003).

3. The record on appeal does not include the transcripts of the proceedings before the trial court. The obligation to provide a complete record was on Winters, as the appellant. *Visco v. Universal Refuse Removal Co.*, 11 Ariz.App. 73, 76, 462 P.2d 90, 93 (1969). "In the absence of a reporter's transcript or an appropriate substitute, [we only] consider matters raised on the face of the pleadings." *Cooner v. Bd. of Educ.*, 136 Ariz. 11, 12, 663 P.2d 1002, 1003 (App.1982).

lationship. We note that, at the time of the Board's action, the term "unprofessional conduct" was neither defined by statute nor by our jurisprudence.[4] In deciding whether Winters' conduct constituted unprofessional conduct, we "may substitute our judgment for agency conclusions regarding the legal effect of its factual findings." *Sanders v. Novick,* 151 Ariz. 606, 608, 729 P.2d 960, 962 (App.1986).

¶ 15 With partial reliance on *Welch v. Board of Education of Chandler Unified School District No. 80 of Maricopa County,* 136 Ariz. 552, 667 P.2d 746 (App.1983), Winters submits that his off-campus conduct for which he is being disciplined must bear a reasonable relationship to his fitness as a teacher. We agree. *See Welch,* 136 Ariz. at 555, 667 P.2d at 749 (holding that whether actual harm to students or school must be shown or whether inference of unfitness to teach can be inferred from the conduct will be decided on a case-by-case basis).

¶ 16 Although Winters would like us to limit "immoral or unprofessional conduct" to teacher-student interactions, we decline to do so. Instead, we hold that the off-campus acts for which a teacher is being disciplined need not be limited to teacher-student interactions, but must relate to his/her fitness as a teacher and must have an adverse effect on or within the school community. This "nexus" requirement has been adopted by the majority of jurisdictions that have considered this issue. *See generally* Jason R. Fulmer, *Dismissing the "Immoral" Teacher For Conduct Outside the Workplace—Do Current Laws Protect the Interests of Both School Authorities and Teachers?,* 31 J.L. & Educ. 271, 285 (2002). ("Regardless of the degree of nexus, most courts say the outside conduct must relate to the teacher's 'fitness to teach.' "); *see also Alford v. Ingram,* 931 F.Supp. 768, 772–73 (M.D.Ala.1996) (and cases cited therein). Consistent with our duty to construe a statute, whenever possi-

ble, in a reasonable manner, *Hansson v. Ariz. State Bd. of Dental Exam'rs,* 195 Ariz. 66, 69, ¶ 11, 985 P.2d 551, 554 (App.1998), we adopt the nexus requirement for purposes of interpreting "immoral or unprofessional conduct" in A.R.S. § 15–203(A)(20).

¶ 17 Our holding is bolstered by the Board's recent amendment to the Arizona Administrative Code ("A.A.C."). Since its decision to revoke Winters' teaching certificate, the Board has detailed the types of conduct constituting "immoral or unprofessional conduct" in A.A.C. R7–2–1308, effective June 28, 2003.[5] Among other activities, the regulation prohibits certificated individuals from "[e]ngag[ing] in conduct which would discredit the teaching profession." A.A.C. R7–2–1308(B)(16). In our opinion, all of the enumerated conduct set forth in A.A.C. R7–2–1308(B) as constituting "immoral or unprofessional conduct" relates to a person's fitness to serve in the capacity of a teacher. *See* A.A.C. R7–2–1308(B).

¶ 18 Next, we must consider whether Winters' conduct related to his fitness to hold a teaching certificate. Citing *Johnson v. Board of Education,* 101 Ariz. 268, 419 P.2d 52 (1966), Winters contends that the Board's decision was not supported by substantial evidence because it improperly relied on all five incidents, when the prosecutions in three of the five incidents were dismissed prior to an adjudication. He argues that merely being charged with a crime is not, as a matter of law, good cause to dismiss a teacher. Unlike the present matter, the teacher in *Johnson* denied the conduct giving rise to the charges and was ultimately found not guilty by a court. *Id.* at 270–71, 419 P.2d at 54–55. Our Supreme Court held that, under those circumstances, the alleged conduct was insufficient. *Id.* at 275, 419 P.2d at 59. Here, Winters admitted his conduct, even as to the incidents for which he was not ultimately adjudicated. In addition, he stipulated to the admission of the facts and exhibits that sup-

4. In *Bills v. Arizona State Board of Education,* 169 Ariz. 366, 370, 819 P.2d 952, 956 (App. 1991), we declined to define "unprofessional conduct" and concluded that the Board was the proper entity to provide the definition because of its superior "sensitivity to this concept in the education field[.]"

5. Although we are not applying the definition to Winters' conduct, we find that the definition provides some guidance.

ported all five incidents. Thus, we reject his claim that the Board improperly considered three of the incidents for which he was not prosecuted.

 ¶ 19 After reviewing the matter, we conclude that Winters' undisputed conduct did relate to his fitness as a teacher. The evidence established his tendency to react with violence and aggression. The frequency of the conduct suggests a pattern of behavior. The fact that these incidents did not occur on school premises does not negate the gravity of Winters' behavior. One conviction involved threatening children and thus directly relates to his fitness as a teacher. Two incidents involved young adults about the age of high school seniors. As a school teacher, Winters would be in regular contact with young people, and his conviction for threats involving harm to children gave the Board reasonable cause for concern and a basis to act "to prevent or control predictable future harm." *Welch,* 136 Ariz. at 555, 667 P.2d at 749.

¶ 20 Winters' favorable letters of recommendation are not determinative. In *Welch,* the court concluded that a teacher had acted unprofessionally even though "the record [was] devoid of any direct evidence that he was unfit to teach or that the district students were adversely affected by his conduct" and his official school evaluations showed that "he was more than satisfactory in performing his teaching duties." *Id.* at 554–55, 667 P.2d at 748–49. The court determined that the teacher's act of lying to the school board upon its inquiry into his personal relationship with a former student constituted insubordination and unprofessional conduct. *Id.* at 555–56, 667 P.2d at 749–50. We agree with the court's sentiments in *Welch:*

> We are unwilling to hold that a school board must demonstrate with particularity the adverse effects of a teacher's conduct upon his students, his teaching performance or the orderly running of the school as a prerequisite for dismissal in all circumstances. There may be conduct which by itself gives rise to reasonable inferences of unfitness to teach or from which an adverse impact on students can reasonably

be assumed. Further, we are concerned that by imposing an absolute requirement that specific harm must be proven prior to dismissal, we would deter school administrators from acting to prevent or control predictable future harm.

*Id.* at 555, 667 P.2d at 749.

 ¶ 21 Winters also argues that the definition of "unprofessional conduct" should be limited to the offenses listed in the fingerprint clearance requirement imposed on teachers pursuant to A.R.S. §§ 15–534(A) (Supp.2003) and 41–1758.03(F) (Supp.2003). A fair reading of the applicable statutes does not support his position. In addition to the requirement that a teacher hold a fingerprint clearance card, section 15–534(D) provides that the Board can decline recertification or take disciplinary action if a teacher engages in immoral or unprofessional conduct. Section 15–534(D) does not refer to the list of offenses precluding fingerprint clearance to define immoral or unprofessional conduct. Had the legislature intended to limit the definition to such enumerated offenses, it could have easily referred to the statutory list in A.R.S. § 15–534(D).

 ¶ 22 Finally, Winters contends that the PPAC failed to refer to the Code of Ethics of the National Education Association ("NEA") to assist it in determining whether his conduct constituted unprofessional conduct. The PPAC is required to refer to this source "to assist in determining whether the acts complained of constitute unprofessional conduct." A.A.C. R7–2–205(G)(5). Our reading of the NEA Code of Ethics further supports the Board's decision.

¶ 23 Although the Code does not specifically prohibit aggressive or threatening off-campus behavior, the Code begins by stating: "The educator accepts the responsibility to adhere to the highest ethical standards." The Code, in part, provides that:

> The desire for the respect and confidence of one's colleagues, of students, of parents, and of the members of the community provides the incentive to attain and maintain the highest possible degree of ethical conduct.
>
> . . . .

The education profession is vested by the public with a trust and responsibility requiring the highest ideals of professional service.

Inherent in these ethical standards is the premise that a teacher should refrain from repeated aggressive, threatening and intimidating behavior especially when such conduct is directed at or involves teenagers and young children.

¶ 24 In summary, Winters' conduct demonstrated a marked tendency toward aggression and violence that, as the PPAC noted, could be elicited by a teenage student or a parent. His pattern of hostile conduct is sufficiently related to his fitness to teach.

Accordingly, we find that the nexus was implicit in the Board's factual findings and affirm the judgment upholding the decision of the Board to revoke Winters' teaching certificate.

CONCURRING: PATRICK IRVINE, Presiding Judge, and SUSAN A. EHRLICH, Judge.