STATE OF MAINE               SUPERIOR COURT
CUMBERLAND, SS.             LOCATION: Portland
                               Docket No. AP-16-21

STEVEN VAFIADES, RANDY )
BICKMORE, and W. DREW CAMPBELL )
                             )
            Petitioners,         )
                             )        **ORDER ON M.R. CIV. P. 80C**
     v.                             )                  **APPEAL**
                             )
MAINE HARNESS RACING )
COMMISSION,                     )
                             )
           Respondent.        )

STATE OF MAINE
Cumberland ss. Clerk's Office

MAR 08 2017

RECEIVED

Petitioners Steven Vafiades, Randy Bickmore, and W. Drew Campbell appeal the April 26, 2016 Decision and Order of the State of Maine Harness Racing Commission ("Commission"). The Decision determined that Petitioners' violated Commission Rule Chapter 11, Section 4, sub-section 4 by racing their horses with concentrations of cobalt in excess of 50 parts per billion ("ppb"). The Decision suspended Petitioners' racing licenses, prohibited them from engaging in any horse racing activities in the State for between 270 and 450 days, imposed financial penalties, and required the forfeiture of numerous purses. Petitioners challenge the Decision arguing that it was not supported by substantial evidence and violated their rights to Due Process.

On June 8, 2016, this court granted Petitioners' motion to stay based on the parties' arguments and papers advanced in support thereof. After careful deliberation and examination of the record, the court denies Petitioners' appeal and affirms the Commission's Decision.

Petitioners-Craig Rancourt, Esq.
and William Childs, Esq.
Respondent-Ronald Guay AAG

1

## I. Background[1]

Petitioners are Maine residents engaged in the sport of harness horse racing. They have participated in Maine, and throughout New England, by owning, training, and/or driving harness horses.

### A. RCI Regulation of Cobalt

In 2015, the Racing Medication and Testing Consortium approved recommendations regulating the permissible amount of cobalt in race horses. (Tr. 16, pp. 63-64; Tr. 35, pp. 139-40.) Those recommendations were forwarded and subsequently adopted by the Association of Racing Commissioners International ("RCI"), the umbrella organization of regulators of professional horse racing in North America, which proposes rules for regulating racing including medical and drug control policies. (Tr. 16, p. 63; Tr. 35, p. 140; Ex. 321-26.) The recommendations suggested two regulatory thresholds that were adopted by the RCI Scientific Advisory Group. (Tr. 35, p. 140; Ex. 321-26.) First, they recommended that "horses with a plasma cobalt concentration greater than 25 parts per billion ("ppb"), but less than 50 ppb be issued a warning and placed on the veterinarian's list until the level falls below 25 ppb." (Ex. 325.) Second, they recommended that "horses with plasma levels greater than 50 ppb should be penalized with a Class B penalty" because the available unpublished data suggests that values greater than 50 ppb are a result of the administration of bulk cobalt salts." (*Id.*) These recommendations were communicated to the Commission in March 2015 prior to being published by the RCI. (Tr. 35, p. 140.)

---

[1] The Record on appeal consists of three volumes. Volume 1 contains pleadings and correspondence as is paginated "P-001" through "P-452." Volume 2 is exhibits, paginated "Exhibits -001" through "Exhibits – 550." Volume 3 is hearing transcripts, paginated as "Transcript 001" through "Transcript 268." The Record is cited to herein as, e.g. "P. 015", "Ex. 015," or "Tr. 15, p. 60" respectively.

On April 28, 2015, RCI issued a press release explaining that its board of directors voted to sanction trainers of horses that were found to have a cobalt level of 50 ppb or greater of blood plasma. (Ex. 455.) The 50 ppb level was based on the unanimous recommendation of the RCI Scientific Advisory Group. (*Id.*) The RCI Scientific Advisory Group reported, in pertinent part that:

> Administration of bulk cobalt salts to humans and other species has been demonstrated to increase red blood cell production at plasma concentrations greater than 300 ppb sustained for greater than or equal to two weeks, and to have toxic effects at concentrations greater than 700 ppb sustained for 8 to 40 weeks depending on the target organ.

(Ex. 322.) The Group noted, however:

> [T]hat extrapolation from other species to the horse is frequently not accurate, and no published studies are available to indicate the plasma concentration that produces an effective or toxic dose in the horse. In the published study by Kynch…equine red blood cell parameters…were not affected by the intravenous administration of a single dose of 49 mg/horse of cobalt, and no toxic effects were observed during the study. The maximum plasma concentration achieved in the study immediately after administration appears to be ~900 ppb….

(*Id.*)

### B. The Commission's March 16, 2015 Notice of Intent

On or about March 16, 2015, the Commission issued a Notice of Intent ("NOI") providing:

### NOTICE OF INTENT

> Effective immediately, the Maine State Harness Racing Commission ("Commission") issues this notice of intent to consider the administration of COBALT as a practice equivalent to blood-doping and further gives notice of its intent to equate the presence of COBALT in elevated levels as the presence of a **CLASS 2 PROHIBITED SUBSTANCE WITH A PENALTY CONSISTENT WITH A CLASS A VIOLATION**.

(Ex. 551) (emphasis in original).

3

Track stewards posted the NOI at Scarborough Downs on or about March 16, 2015. (Tr. 91, pp. 97-87.) The NOI was posted in Bangor, when the track opened, on or about May 2, 2015. (Tr. 91, p. 99.) Petitioner Campbell saw the NOI on March 18, 2015 (Tr. 177, p. 133), Petitioner Bickmore saw it on or about March 27, 2015 (Tr. 180, p. 146), and Petitioner Vafiades saw it at the end of March or first week of April (Tr. 183, pp. 156-57).

### C. The Nature of Cobalt

Cobalt is a naturally occurring trace mineral that is essential to the health of horses and all mammals and is normally ingested as part of vitamin B12. (Tr. 123, pp. 228-229; Ex. 344.) Horses obtain cobalt from a variety of sources including hay, water, and grain. (Tr. 98, pp. 114-15.) Horses may also obtain cobalt from mineral blocks, and mineral supplements. (*Id.*) Cobalt is not a stimulant, narcotic, or depressant, and has been prescribed for the therapeutic purpose of treating abnormally low red blood cell counts. (Tr. 126, p. 240.) Cobalt can also be used for tying up, which is the prevention of muscle cramping. (*Id.*)

### D. Administration of Cobalt to Petitioners' Horses

Petitioners stated that they regularly gave their horses supplements through the use of containers known as "ringers" or "jugs". (Tr. 177, pp. 131-134; Tr. 181, pp. 148-50; Tr. 183, pp. 155-57.) Ringers are plastic bags that contain a liquid mix of vitamin and mineral supplements that are administered orally or intravenously, and can include cobalt. (Tr. 177, pp. 131-33.) The ringers were given after a veterinarian had drawn and tested the horse's blood, and the supplement ringer was prescribed, and frequently administered by, the veterinarian. (Tr. 177, pp. 133-32; Tr. 181, p. 150; Tr. 183, pp. 155-

4

56.) The ringers were purportedly given in order to bring the horses' blood values for the various vitamins and minerals, including cobalt, back to what the veterinarians deemed "normal" values. (*See id.*)

Petitioners Campbell and Bickmore testified that they regularly utilized the services of Dr. Donald Heisler who would draw blood, determine what deficiencies were present, and based on those results prescribe ringers with the necessary supplements to return the blood to normal. (Tr. 177, pp. 131-132; Tr. 179, pp. 140-41; Tr. 181, p. 149.) Petitioner Vafiades testified that Dr. Dennis Ruksznis prescribed cobalt supplements for his horses in order to ensure that their blood counts were in the normal range. (Tr. 183, pp. 155-56.)

E. Presence of Cobalt in Petitioners' Horses

In 2013 or early 2014, testing blood samples for the presence of cobalt became a national issue that started making the news. (Tr. 87, pp. 82-83.) Following publication of the NOI, the Commission began including cobalt screening in its routine post-race testing program. (Tr. 87-88, pp. 83-86.) Post-race testing indicated that horses trained by Petitioner Vafiades participated in races while having cobalt in their systems in the blood concentration amounts described in the following table:

| Race Date | Horse | Race | Finish | Cobalt Level (ppb) |
| --- | --- | --- | --- | --- |
| March 28, 2015 | Check Dons Pule | 7 | 3 | 560.4 |
| March 29, 2015 | Miss Paula D | 4 | 1 | 589.4 |
| April 4, 2015 | Bubeleh Stone | 7 | 2 | 1,271.0 |
| April 11, 2015 | Sam Lucky | 3 | 1 | 473.9 |

5

| April 18, 2015 | Sam Lucky | 5 | 3 | 609.1 |
|---|---|---|---|---|
| April 18, 2015 | Check Dons Pulse | 7 | 1 | 409.3 |
| April 25, 2015 | Bubeleh Stone | 10 | 1 | 394.6 |
| April 25, 2015 | Sam Lucky | 7 | 1 | 477.2 |
| April 26, 2015 | Skyway Shanisa | 9 | 2 | 465.4 |
| April 26, 2015 | Victory Tax | 10 | 1 | 233.2 |
| May 3, 2015 | Skyway Shania | 6 | 1 | 205.1 |
| May 3, 2015 | Victory Tax | 7 | 1 | 108.0 |
| May 3, 2015 | Justrollwithit | 1 | 1 | 73.2 |
| May 16, 2015 | Bubeleh Stone | 9 | 1 | 68.4 |

(Ex. 444.)

Similar testing for Petitioner Bickmore's horses revealed the following:

| Race Date | Horse | Race | Finish | Cobalt Level (ppb) |
|---|---|---|---|---|
| April 5, 2015 | Luvnuisfun | 1 | 2 | 906.1 |
| April 5, 2015 | Moon Is On Fire | 7 | 1 | 1,687.0 |
| April 12, 2015 | Luvnuisfun | 1 | 1 | 357.1 |
| April 18, 2015 | Ringo | 7 | 2 | 1,041.0 |
| April 19, 2015 | Moon Is On Fire | 9 | 1 | 224.9 |
| April 25, 2015 | Luv U A Lot Hanover | 6 | 1 | 425.4 |

| April 26, 2015 | Moon Is On Fire | 8 | 2 | 106.4 |
| May 9, 2015 | Regal Delight | 5 | 2 | 157.2 |
| May 16, 2015 | Ringo | 7 | 1 | 113.8 |

(Ex. 444.)

Finally, testing for Petitioner Campbell's horses were as follows:

| Race Date | Horse | Race | Finish | Cobalt Level (ppb) |
|---|---|---|---|---|
| March 29, 2015 | JJS Jet | 8 | 2 | 377.5 |
| April 5, 2015 | Remix | 8 | 1 | 167.3 |

(*Id.*) As demonstrated in the tables above, and as testified to by Dr. Clara Fenger, each of Petitioners' horses that were tested on multiple dates show a "trend on cobalt levels over time, race date to race date, [that] is decreasing in one hundred percent of the cases. (*Id.*; Tr. 132, pp. 263-64.)

The blood samples listed above, along with others, were sent to a laboratory for testing in two groups. (*See* Ex. 444.) The first group included the samples drawn between March 28 and April 19, 2015. (*See id.*) The Commission received the results from the lab on May 4, 2015. (*See id.*) The results were subsequently sent for additional rounds of testing the results of which were received on or about May 15, 2015, and May 27, 2015. (*Id.*) Petitioners were not notified of the results for the first group until after June 15, 2015. (Ex. 13-15, 85-87, 169-71.) The second group included the samples drawn between April 25, 2015 and May 16, 2015, but did not include any samples from Petitioner Campbell's horses (Ex. 444.) The Commission received the results on June 23,

7

2015, but sent the results for an additional round of testing that was not completed until July 7, 2015. (*Id.*) Petitioners were not notified of these results until after July 28, 2015. (Ex. 46-48, 173-175.) The notices of positive test results did not quantify the values of a normal or elevated level of cobalt, providing only that the blood tests "disclosed the presence of an excessive level of cobalt." (Ex. 13-15, 46-48, 85-87, 169-71, 173-75.)

The notices of positive test results informed Petitioners of their right to request confirmatory testing, and that a notice of hearing would be forthcoming. (*See id.*) Notices of hearing were sent to the Petitioners. (Ex. 1-2, 9-10, 77-82, 157-58.) The Petitioners' cases were subsequently consolidated and a hearing was commenced on October 28, 2015, which continued over the course of January 22, 2016, February 24, 2016, and May 16, 2016. (*See* Tr. 1, 67, 144, 239.) During the proceedings, the parties stipulated to the following facts:

1.) There was no defect in the chain of custody of the equine blood samples until they were received by the LGC Science Laboratory;

2.) The Licensees were the trainers of record for each horse identified in their respective notices of positive test results or similar instrument;

3.) The horses did race on the dates identified in their respective notices of positive test results or similar instrument;

4.) There was no defect in the chain of custody of the equine blood samples after they were received by the LGC Science laboratory to final processing by the University of Kentucky;

5.) The authenticity of the video recording to be reviewed by Dr. Waldridge;

6.) The placement of the horses for their respective races; and

7.) Exhibit 136 (Ex. 444) is a true and accurate representation of cobalt test results, and race dates for the horses trained by the Licensees.

8

(Tr. 170, pp. 104-105.) As a result, the disputed issues were: 1) whether the levels of cobalt in the subject horses were at a level greater than what occurred naturally; and 2) whether cobalt is, in fact, a performance-affecting substance.

F.  Evidence Presented to the Commission Regarding the Naturally Occurring Levels of Cobalt in Horses

Dr. Richard A. Sams, Ph.D., has a specialization in pharmaceutics and pharmacokinetics and is the Scientific Director at LGC Science Incorporated testified that a normal, untreated horse will typically have cobalt concentrations of one to two ppb. (Tr. 24-25, pp. 95-98; *see* Ex. 327-342.) He testified that this conclusion was based on "thousands of samples from official racehorses...." (Tr. 25, p. 98.) Dr. Bryan Waldridge testified that the results of his experimental testing of three horses demonstrated cobalt concentration levels of .8, 1.2, and 1.5 ppb. (Tr. 44, p. 173.) He further testified that in his experience, the vast majority of horses would be below 25 ppm of cobalt. (*Id.*) Dr. Zachary Matzkin, a state veterinarian working with the Department of Agriculture, testified that it was the opinion of the RCI groups that "you could not achieve a level over 50 [ppb] without what they call a bulk administration of cobalt." (Tr. 100, p. 134.)

G.  Evidence Presented to the Commission about Whether Cobalt is a Performance Affecting Substance.

The question of whether cobalt enhances performance of a racehorse and, if so, at what level is the topic of ongoing studies including one by the United States Trotting Association ("USTA"). (Ex. 459.) The announcement of the USTA study states, in pertinent part that "other than establishing the natural levels, little is really known about the effects of cobalt on horses when it is given in excessive amounts." (*Id.*) "Racing jurisdictions have set thresholds to regulate the use of cobalt because it is known to be

9

toxic in humans[,]" but there is "currently no scientific evidence to determine an appropriate threshold for horses because dose-response studies have not been reported." (*Id.*) Additionally, the announcement states that "there have been no controlled studies to document the purported performance-enhancing effects of cobalt." (*Id.*)

Likewise, Dr. Waldridge and Dr. Richard Sams testified that they were aware of no scientific studies showing cobalt had an effect on the performance of a horse. (Tr. 28, p. 112, Tr. 50, p. 197.) Dr. Sams further testified that he was aware of two studies that have addressed the effect of cobalt on horse performance and neither of the studies indicated cobalt has a demonstrable effect on the production of equine erythropioetin or EPO—claimed to enhance red blood cell count and so enhance performance. (*See* Tr. 17, p. 68.) Indeed, the Commission staff's attorney conceded that "the evidence in this case did not show the existence of any documented scientific study to support this claim with regard to horses." (P. 372.) He asserted, however, that "there is also no scientific study that rules it out." (*Id.*)

Dr. Matzkin testified that in his professional opinion, administering cobalt for the purpose of increasing the red blood cell count to carry oxygen to the muscles of a racehorse is "a very efficient way to increase performance in a race." (Tr. 100, pp. 135-36.) He further opined that if cobalt prevents tying up in a race, he would call that performance enhancing. (Tr. 100, p. 136.) Dr. Matzkin earlier testified that he believed cobalt was being used to increase red blood cell production "based on conversations or involvement around the track[.]" (Tr. 88, p. 87.) Additionally, Dr. Matzkin testified that science has shown cobalt to be performance enhancing for other species, but "no one's

10

ever done studies" as to its effect on horses, although such studies are being undertaken currently. (Tr. 90-91, pp. 96-97.)

Dr. Fenger testified that the number one reason cobalt has been prescribed to racehorses for at least twenty years is the therapeutic purpose of combatting anemia, with the aim of treating an abnormally low red blood cell count. (Tr. 126, p. 240.) In her personal experience, however, she has been disappointed in cobalt's effects to treat anemia, but has used cobalt "repeatedly and regularly for tying up until it was made illegal this last year in Kentucky." (Tr. 127, p. 241.) "Tying up" is the prevention of muscle cramping. (*Id.*) Dr. Fenger asserted that cobalt is a "very effective preventative for painful muscle cramping during racing" and that its use "was brilliant actually, because it's not a drug. It's a natural treatment and you can give it to them three or four days out from racing, so you're outside the injury box. And it prevents them from tying up for, you know, a significant amount of time, so it was very useful." (*Id.*)

In 2015, Dr. Fenger published an article entitled "Musings on Equine Medicine," in which she wrote:

> ...The potential illicit use of cobalt to improve athletic performance is based on the cellular actions of cobalt, leading to its recent and reportedly widespread use in horse racing (Paulick, 2014; Merkeberg, 2013).
>
> A high dose of cobalt triggers a series of events which increases endogenous blood concentrations of EPO. Cobalt increases a protein in the cell called Hypoxia Inducible Factor (HIF-1a). High intracellular HIF-1a causes direct activation of the erythropoietin gene resulting in increased plasma concentrations of erythropotein, which would then drive the increase in red cell formation and an equivalent increase in the animal's hematocrit (Semenza, 2014). In addition to its EPO effects, other effects include increased blood supply to the muscle, and increased efficiency of energy utilization.
>
> The theory is interesting but does this really work in horses? ...The consensus from the literature including multiple studies in multiple species

11

is that chronic blood concentrations of 300 ppb and less are not associated with hematological or toxicological effects, whereas chronic concentrations in excess of 300 ppb are associated with both hematological and toxicological effects (Finley et al, 2012).

In racehorses, cobalt is typically administered a day or two before racing. It seems unlikely that cobalt directed changes in EPO gene transcription or capillarity of muscles could be in effect at the time of the race if cobalt is administered only a few days before competition. However, a small subset of horses, specifically among Standardbreds, seems to have impressive racing performances pursuant to [cobalt] administration two days pre-race…. Standardbreds are unique among racing breeds in that they are susceptible to "typing up" during racing…. Since tying up is prevalent among Standardbreds, and other preventative treatments for this condition are banned on race day, the purported performance enhancing effect of [cobalt] administration two days before racing may simply be prevention of tying up.

(Ex. 315-16; Tr. 135.)

That article went on to state that "[n]o dose response studies have been performed to determine at what level cobalt has any effect on horses." (Ex. 318.) "However, a review of the literature in the animals which have been studied, which includes humans, lab animals, dogs and pigs indicates that a sustained cobalt level above 300 ppb is required for cobalt to exert its hematopoietic and other effects." (*Id.*) The article concludes that "[t]he regulation of cobalt in North America has come about with great fanfare and headlines, but science has yet to catch up. The thresholds adopted fail to hold up to scientific scrutiny, and, like so many other regulations in this day and age, are more likely to trap innocent horseman then those actually cheating." (Ex. 319.)

Dr. Fenger testified that based on her scientific opinion, cobalt is not performance enhancing. (Tr. 124, p. 230.) "However, if you want to include things such as a horse has a low grade respiratory infection and, therefore, it can only…trot at 2:01, but as soon as you treat the underlying respiratory infection, all of a sudden the horse drops four

12

seconds…then everything – including feed, hay, and water – gives performance enhancement. (Tr. 124, pp. 230-31.)

Dr. Fenger also testified that the so-called Kynch study is the only study and leading article in the veterinary scientific word regarding the use of cobalt on horses. (Tr. 123, p. 231.) The Kynch study injected eighteen horses with a single intravenous dose of approximately 109 milligrams of cobalt chloride, which comes to 49 milligrams of elemental cobalt. (Ex. 460, 463; Tr. 124, pp. 231-32.) The study found no significant change in EPO concentrations following cobalt administration over the 10-day study period, but noted "that only a single cobalt administration was studied and the results may be different with multiple or chronic administration." (Ex. 466.)

When asked if she considered the supplementation of cobalt to a racehorse to be performance enhancing, Dr. Fenger answered, "No." (Tr. 124, p. 230.)

Finally, Dr. Sams testified about how cobalt affects mammals in general explaining:

> The concerns with cobalt are essentially two-fold. One is that it has been known for a considerable period of time that cobalt iron administration to animals and to humans creates…what I would refer to as false hypoxia. There are proteins in the blood that respond to decreased oxygen in the blood. And when there is a decrease in oxygen in the blood, these proteins stimulate the production of new red blood cells, which are necessary to improve the oxygen-carrying capacity of blood.
> …
> In mammals in general, cobalt administration stabilizes the hypoxia-indicating factors and causes them to produce erythropoietin, which results in the production of red blood cells. That's the general observation and is one of the reasons that there has been concern about the administration of cobalt to horses. The other concern has to do with toxicity of cobalt in mammals, in the excessive concentration or excessive amounts of cobalt are associated with a variety of adverse effects that are somewhat species dependent. Excessive amounts of cobalt in the diet produce signs of listlessness, lethargy, inappetence and a variety of other conditions. Again,

13

I'm speaking in general terms about the effects of cobalt on mammals, not specifically horses.

(Tr. 17, pp. 65-67.)

### H. The Commission's Decision

The Commission's Decision concluded that Petitioners' violated Commission Rule Chapter 11, Section 4, sub-section 4 because their horses carried a prohibited substance in their system when racing on the dates at issue. (P. 32.) In reaching this Decision, the Commission determined that, for purposes of a violation, a concentration of 50 ppb or more of cobalt in horses constitutes a higher level than would be present as a result of natural occurrence. (P. 29-30.) The Commission further found that cobalt is performance enhancing, as a matter of fact, based on the testimony of Drs. Fenger and Matzkin. (P. 30.) The Commission noted that it considered contradictory evidence, but nevertheless determined cobalt was performance enhancing. (*Id.*)

### I. Regulatory Framework

The Harness Racing Commission's Rules regarding medication and testing were promulgated "to protect the integrity of live harness horse racing, to guard the health of the horse, and to safeguard the interests of the public and the racing participants through the prohibition or control of all prohibited substances." 01-017 C.M.R. ch. 11 § 1(1). The Rules provide that "a substance shall not be present in a horse in excess of a concentration at which the substance could occur naturally if it affects the performance of a horse." *Id.* at §4(4). Trainers are responsible for the presence of a prohibited substance in horses under their care and to prevent the administration of a substance that may constitute a violation of this administrative regulation. *Id.* at 1(8)(B) & (C).

14

## II.  Standard of Review

The court reviews the Commission's decision pursuant to Rule 80C for errors of law, abuse of discretion, or findings not supported by substantial evidence in the record. *Davric Me. Corp. v. Maine Harness Racing Comm'n*, 1999 ME 99, ¶ 7, 732 A.2d 289. The court will not overrule findings of fact that are supported by substantial evidence, which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support the resultant conclusion." *Cheney v. Unemployment Ins. Comm'n*, 2016 ME 105, ¶ 6, 144 A.3d 45 (quoting *Sinclair Builders, Inc. v. Unemployment Ins. Comm'n*, 2013 ME 76, ¶¶ 9-10, 73 A.3d 1061). "The 'substantial evidence' standard does not involve any weighing of the merits of evidence. Instead it requires us to determine whether there is any competent evidence in the record to support a finding." *Friends of Lincoln Lake*, 2010 ME 18, ¶ 14, 989 A.2d 1128.

When conflicting evidence is presented, such conflicts are for the fact finder to resolve. *Bean v. Maine Unemployment Ins. Comm'n*, 485 A.2d 630, 634 (Me. 1984). Credibility determinations are "exclusively the province of the Commission'and will not be disturbed on appeal." *Sprague Electric Co. v. Maine Unemployment Ins. Comm'n*, 544 A.2d 728, 732 (Me. 1988). Stated differently, the court may not substitute its judgment for that of the agency merely because the evidence could give rise to more than one result. *Dodd v. Secretary of State*, 526 A.2d 583, 584 (Me. 1987) (citing *Gulick v. Bd. of Envtl Prot.*, 452 A.2d 1202, 1209 (Me. 1982)). However, "[f]act-finders must, however, rely on evidence, not speculation in fact-finding and [the court] must vacate decisions where fact-finding was unsupported by evidence." *Hannum v. Bd. of Envtl. Prot.*, 2003 ME 123, ¶ 15 n.6, 832 A.2d 765; *Green v. Comm'r of the Dep't. of Mental*

15

*Health, Mental Retardation and Substance Abuse Servs.*, 2001 ME 86, ¶ 12, 776 A.2d 612 (to disturb an agency's findings the burden of the Petitioner is to show "that there was no competent evidence to support those findings").

When a dispute involves an agency's interpretation of its own rules, regulations, or procedures, the court gives "considerable deference to the agency and will not set aside the agency's interpretation unless the regulation or rule compels a contrary interpretation." *Nelson v. Bayroot, LLC*, 2008 ME 91, ¶ 17, 953 A.2d 378. If the rule or regulation is ambiguous, the court reviews whether the Commission's construction is reasonable. *See Guilford Transp. Indus.. v. PUC*, 2000 ME 31, ¶ 11, 746 A.2d 910. The court does not "second-guess" an agency on issues within its area of expertise. *Town of Eagle Lake v. Comm'r Dep't. of Edu.*, 2003 ME 37, ¶ 8, 818 A.2d 1034 (citation omitted). Instead, the court reviews only to ascertain whether the Commission's conclusions are unreasonable, unjust, or unlawful. *Id.*

"If the agency's decision was committed to the reasonable discretion of the agency, the party appealing has the burden of demonstrating that the agency abused its discretion in reaching the decision." *Forest Ecology Network v. Land Use Regulation Comm'n*, 2012 ME 36, ¶ 28, 39 A.3d 74 (citation omitted). "An abuse of discretion may be found where an appellant demonstrates that the decisionmaker exceeded the bounds of the reasonable choices available to it, considering the facts and circumstances of the particular case and the governing law." *Id.*

"The burden of proof clearly rests with the party seeking to overturn the decision of an administrative agency." *Seven Islands Land Co. v. Maine Land Use Regulation Comm'n*, 450 A.2d 475, 479 (Me. 1982) (citation omitted).

16

## III. Discussion

Petitioners raise three primary arguments attacking the Commission's Decision: 1) there is no competent evidence supporting the determination that cobalt affects the performance of horses; 2) Petitioners did not receive fair notice that cobalt was a prohibited substance in violation of their due process rights; and 3) heightened penalties were imposed on them for second and subsequent offenses for which they had not received fair notice of the first offense. The court addresses these arguments in turn.

### A. Whether the Commission's Decision was Unsupported by Substantial Evidence on the Record as a Whole

Petitioners argue that the testimony of Dr. Zachary Matzkin and Dr. Clara Fenger do not support the Commission's conclusion that cobalt is performance enhancing. They argue that Dr. Matzkin's opinion was based on "conversations…around the track" and that he conceded during cross-examination the science regarding cobalt's affect on the performance of horses in racing is unproven and unsettled. Petitioners further argue that Dr. Fenger reviewed the lack of scientific studies or data showing the link between cobalt, increased red blood cell count, and enhanced performances in horses, and unequivocally answered in the negative when asked if the supplementation of cobalt to a racehorse enhanced performance.

Petitioners also contend that the Commission's determination that the therapeutic use of cobalt to alleviate muscle cramping is performance enhancing leads to absurd results. Taken to its logical conclusion, this line of thinking could result in the determination that any substance that helps bring a horse back to normal health is a prohibited, performance enhancing substance.

17

Petitioners further argue that the other expert witnesses, Dr. Richard Sams and Dr. Brian Waldridge, acknowledged the lack of studies linking cobalt to enhanced performance in horses. Additionally, the article announcing the USTA funded study on the topic flatly stated that "there have been no controlled studies to document the purported performance-enhancing effects of cobalt." (Ex. 459.) Similarly, the ARCI Scientific Study Group Report's press release gives no support for the Commission's determination as it warned against extrapolating from other species to horses as such extrapolation is "frequently not accurate" and no published studies have indicated the plasma concentration of cobalt that provides an effective or toxic dose in horses. (Ex. 344.) Lastly, Petitioners argue cobalt's regular prescription by licensed Maine veterinarians indicates it was not considered performance enhancing.

Respondent counters that competent evidence in the record supports the Commission's determination that cobalt affects the performance of horses. Respondent points to Dr. Sams' testimony regarding how cobalt affects mammals in general, Dr. Matzkin's testimony that cobalt increases red blood cell count and is a very efficient way to increase performance in a race, and Dr. Fenger's testimony that cobalt has been prescribed to treat abnormally low red blood cell counts. They further argue that the Commission was not obligated to accept the testimony of Dr. Fenger that it has not been proven to a scientific certainty that cobalt enhanced the performance of race horses.

Respondent also points to expert testimony that cobalt can affect a horse's performance by preventing painful muscle cramping while racing. If a horse does not tie up during a race, it will perform better. They argue that considering the treatment of tying up to be performance enhancing is not illogical because nothing prevents a trainer from

18

using such a substance to bring a horse back to health, but not racing the horse until the level of the substance returns to its naturally occurring level.

Petitioners reply that from the first posting about cobalt in the horse paddocks, the case was based on the Commission's theory that the use of cobalt was a form of blood doping, it was not about preventing horses from tying up. They further argue that while Dr. Sams testified as to the effect of cobalt on the production of EPO in mammals generally, he readily acknowledged that two studies failed to show a demonstrable effect of cobalt on the production of equine EPO and stated that he was aware of no studies demonstrating cobalt could affect horse performance. At any rate, the Commission did not rely on the testimony of Dr. Sams.

Petitioners next argue that while Dr. Matzkin testified that increasing red blood cells is an efficient way to increase performance in a race, no one has ever studied whether this holds true for horses, the science is unknown. Petitioners emphasize that Dr. Fenger testified, without qualification, that the administration of cobalt supplements to racehorses was not performance enhancing. While she testified that some veterinarians believe cobalt is helpful in treating horses with anemia because it helps with sub-normal red blood cell counts, she did not testify that it boosts red blood cell counts beyond a normal level. Additionally, the argument of Respondent that cobalt could be given to a horse to treat a low red blood cell count as long as the horse does not race ignores the fact that horses are subject to testing even when stabled off association grounds for "blood doping agents including…any substance that abnormally enhances the oxygenation of body tissues. 01-017 C.M.R. ch. 11 § 12(5)(A). If the Commission's Decision is correct, cobalt could not be used for its recognized therapeutic uses even if the horse did not race.

19

Here, mindful of the constraints imposed by the standard of review, the court determines that the record contains competent evidence to support the Commission's conclusion that cobalt enhances performance. Specifically, there is competent record evidence from which the Commission could have concluded that cobalt aids in the prevention of tying up which, in turn, increases racing performance through the avoidance of painful muscle cramping. Dr. Fenger testified that, in her personal experience, cobalt has been used "repeatedly and regularly for tying up[.]" (Tr. 127, p. 241.) That is, cobalt has been used to prevent painful muscle cramping during racing. (*Id.*) Furthermore, an article drafted by Dr. Fenger entitled "Musings on Equine Medicine," states that "a small subset of horses, specifically among Standardbreeds, seems to have impressive racing performances pursuant to [cobalt] administration two days pre-race." (Ex. 315.) "Since typing up is prevalent among Standardbreds, and other preventative treatments for this condition are banned on race day, the purported performance enhancing effect of [cobalt] administration two days before racing may simply be prevention of tying up." (Ex. 315-16.) While Dr. Fenger ultimately concludes that the prevention of trying up is not performance enhancing, the Commission does not have to accept her opinion on this topic. To the contrary the Commission could, and seems to, have accepted the testimony of Dr. Matzkin that if cobalt prevents tying up in a race, it increases a horse's performance. (Tr. 100, p. 136.)

While the record is clear that there are no scientific studies demonstrating the performance enhancing effects of cobalt on horses, Maine Law and Commission Rules do not require scientific certainty or definitive studies to support a Commission decision. Indeed, Maine law simply requires competence evidence, which is a lower burden than

similar standards applied to certain federal agencies. *See e.g. Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 656 (1980) ("OSHA is not required to support its finding that a significant risk exists with anything approaching scientific certainty. Although the Agency's findings must be supported by substantial evidence, [a federal statute] specifically allows the Secretary to regulate on the basis of the 'best available evidence'"); *Defenders of Wildlife v. Jewell*, 2014 U.S. Dist. LEXIS 50614, *24-25 (C.D. Cal. Apr. 2, 2014) ("While it is impermissible for FWS to act on the basis of 'speculation or surmise,' the agency need not refuse to take any action until it achieves scientific certainty. The ESA tolerates uncertainty so long as the agency relies on 'the best scientific data *available*'") (citations omitted) (emphasis in original). Accordingly, the undisputed scientific uncertainty as to whether cobalt increases the performance of horses does not compel a finding that it does not enhance performance.

Finally, the fact that cobalt may have therapeutic uses does not prevent it from being a prohibited substance. Undoubtedly, many prohibited substances have ancillary, or even primary, therapeutic benefits. This does not prevent the Commission from prohibiting their use.

B. Whether Petitioners' Due Process Rights Were Violated by a Lack of Fair Notice or Failure to Use the Rule-Making Process

Petitioners argue their due process rights were violated because there were no measurable, quantifiable values from which to determine the normal level of cobalt in a horse, or what constituted an elevated level. Petitioners contend that the regulation of cobalt requires more precise notification requirements of the proscribed levels than many other regulated substances because it is a naturally occurring mineral that is naturally present in all mammals. Thus, while the phrase "elevated levels" might be understood to

mean "any measurable amount" for manufactured substances, the naturally occurring levels of cobalt vary given that horses regularly receive cobalt supplements in commercially available feed.

Petitioners further contend that the Commission purported to prohibit elevated levels of cobalt, but did so: 1) in the absence of a statutory or regulatory definition of the term; 2) in the absence of the publication of any contemporaneous definition; 3) in the absence of the Commission having drawn any distinction between manufactured and naturally occurring substances like cobalt; 4) in the absence of any fact-finding or data-driven analysis of its own regarding what were normal or elevated levels; and 5) with the knowledge that the ARCI had published no recommended guidelines on cobalt levels. In sum, Petitioners argue that the Commission failed to make reasonably clear the level at which cobalt would be considered "elevated" at any junction before the races leading to the charges and only provided haphazard notice of its intent to begin enforcement of that rule. Petitioners also appear to argue that the Commission's failure to categorize cobalt as a prohibited substance through the rule making process was improper and violated their due process rights.[2]

Respondent counters that the March 16, 2015 NOI was not the adoption of a new legal requirement, it was simply an advance courtesy communication that horses racing with elevated levels of cobalt could be violating the law. Respondent asserts that there is no due process requirement for the Commission to explicitly determine and announce the level of a substance that occurs naturally in a horse before disciplining a trainer for racing

---

[2] Petitioners assert in their reply brief that they are not arguing the Commission was required to conduct formal rulemaking to establish cobalt as a prohibited substance prior. Instead, they "are asserting that the statutory rulemaking process was 'a readily available option' to the Commission as an alternative to this enforcement action" that would have provided the notice, clarity, and transparency lacking in the present action. (Pet.'s Reply Br. 10.)

a horse whose level of the substance is proved at hearing to be above the naturally occurring level. This is because the existing Commission rule already established a standard by which the Commission could impose discipline for the presence of cobalt. Given the strict liability regulatory scheme, the Commission had no duty to go through a rulemaking or announce in advance each substance and the level of the substance that would have to be present in a horse before it could discipline the responsible trainers.

To hold otherwise would mean trainers are free to administer any substance that might give their horse an unfair advantage as long as the Commission did not determine in advance and announce the level at which the substance occurred naturally in a horse. The Commission's actions to the contrary are consistent with its mission to protect the integrity of live harness horse racing, to guard the health of the horse, and to safeguard the interest of the public and the racing participants. 01-017 C.M.R. ch. 11, § 1(1).

Petitioners reply that Respondents' argument would have more force if the NOI had pertained to a medicine or substance that was not naturally occurring in horses. They argue it is unpersuasive where the substance occurs naturally, has historically been given to horses in their feed, and has therapeutic uses such as treating anemia.

"Concepts of due process flowing from both the Fourteenth Amendment of the United States Constitution and Article I, § 6-A, of the Maine Constitution, require that those subject to sanction by law be given "fair notice of the standard of conduct to which they can be held accountable." *Town of Baldwin v. Carter*, 2002 ME 52, ¶ 10, 794 A.2d 62. A regulation is improperly vague when its language "either forbids or requires the doing of an act in terms so vague that people of common intelligence must guess at its meaning, or if it authorizes or encourages arbitrary and discriminatory enforcement." *Id.*

23

(citations omitted). "Persons engaged in activities subject to state or local regulation are entitled to know with reasonable clarity what they must do to engage in the regulated activities without violation of the law or to obtain the permits or approvals they seek. *State v. McCurdy*, 2010 ME 137, ¶ 17, 10 A.3d 686.

The Commission's rules need not state on their face the prescribed conduct in every factual scenario for it to be constitutionally applicable to a professional within the field. *Mitchell v. Maine Harness Racing Comm'n*, 662 A.2d 924, 927 (Me. 1995); *Andrews v. Bd. of Soc. Worker Licensure*, 2005 Me. Super. LEXIS 117, *13 (Sept. 2, 2005) (Cumberland County, *Crowley, J.*). In *Mitchell*, the Law Court affirmed decisions of the Maine Harness Racing Commission finding that the trainers at issue had violated Commission regulations by administering sodium bicarbonate, a "banned substance," to their horses. 662 A.2d at 925-26. The trainers argued, among other things, that the Commission failed to comply with the requirements of the Maine Administrative Procedure Act ("APA") by failing to adopt a rule that sodium bicarbonate was a banned substance. *Id.* at 926. The Commission had promulgated a regulation that defined a "banned substance" as:

1. any foreign substance, including a narcotic, stimulant, depressant, tranquilizer, local anesthetic, analgesic, drug or drug metabolite, or biological substance, other than equine feeds or nutritional supplements as defined by the Federal Drug Administration [sic], at a level greater than the level found in the normal, untreated horse that might effect [sic] the performance of a horse; or

2. any foreign substance, regardless of how harmless or innocuous it might be that might interfere with the detection or quantization of a narcotic, stimulant, depressant, tranquilizer, local anesthetic, analgesic, drug or drug metabolite, or biological substance, other than equine feeds or nutritional supplements as defined by the Federal Drug Administration [sic], at a level greater than the level found in the

24

normal untreated horse that might effect [sic] the performance of a horse.

*Id.* at 926-27. The Law Court explained that "[a]fter promulgating this rule, the Commission did not have to enumerate every substance that comes within its definition of a 'banned substance.' Instead, during the hearings the Commission may determine that sodium bicarbonate is a banned substance, pursuant to its definition to establish that the trainers have committed a violation." *Id.* at 927 (citing *DeGroot v. Arizona Racing Comm'n,* 141 Ariz. 331, 686 P.2d 1301, 1311 (Ariz. Ct. App. 1984) (drug determined to be a prohibited substance from the evidence presented at hearing); *Berry v. Michigan Racing Comm'r,* 116 Mich. App. 164, 321 N.W.2d 880, 884-85 (Mich. Ct. App. 1982) (relying on testimony of two doctors, hearing officer determined apomorphine was a stimulant)).

Here, Petitioners' Due Process Rights were not violated by a lack of fair notice. Sufficiently clear notice was provided by the Commission's rule prohibiting the presence of a substance that affects the performance of horses in a concentration "in excess" of that which would "occur naturally" in a horse. As with *Mitchell*, the Commission is not required to list every substance that is prohibited as affecting the performance of a horse or to list the naturally occurring level of every substance that affects the performance of a horse. Instead, the Commission must determine the amount, as it did here, based on the evidence presented to it at hearings.

Furthermore, the Commission was not required to draft a rule categorizing cobalt, as a prohibited substance. Sufficient Due Process was provided through the hearing process at which the Commission determined cobalt enhances the performance of horses and that it was present in Petitioners' horses at concentrations in excess of what naturally

25

occurs in horses. As Respondent points out, had the Commission adopted a rule, the Commission would not have had to make the above-mentioned showings by a preponderance of the evidence. Accordingly, while there may be strong practical reasons for the Commission to have utilized the rule making process or provided greater and more explicit notice than it did, it was not required by Due Process.

Finally, the court notes that the Commission is acting within its mandate by essentially placing the onus on trainers to refrain from administering substances to their horses unless they know exactly what the substance can do. Should trainers mistakenly or innocently administer substances that affect the performance of a horse, they are liable for penalization according to the Commission's Rules.

C. Whether it was Fundamentally Unfair to Impose Heightened Penalties on Petitioners for Repeat Violations Before Petitioners Received Notice of a First Offense

Petitioners argue that they were improperly charged with multiple violations of the prohibition on cobalt and sanctioned with heightened penalties without any notice that they were violating a Commission rule. Petitioners contend that the March 16 NOI did not provide them fair warning, the Commission did not publish the ARCI standards to Petitioners, and the Commission failed to rectify its flawed notice when it chose not to promulgate its own cobalt rule. Most egregiously, the Commission did not disclose the results of the first group of blood tests—taken from samples drawn between March 28 and April 19, 2015—until June 15 despite first receiving the results thereof no later than May 4, 2015. This action was in contravention of the Commission's own rules emphasizing that notice of a violation should be accomplished quickly. Petitioners Vafiades and Bickmore argue that had they promptly received notice, they could have

26

chosen not to race their horses that received cobalt supplements and avoid heightened penalties.[3]

Respondent counters that, in essence, Petitioners are arguing that they could not have known that they were violating the rule until they received notice of a violation. Respondent contends that this theory does not reflect the facts in the present case as all Petitioners saw the NOI, knew that cobalt affected the blood of their animals, knew they had administered bulk cobalt, and knew they could be punished for racing horses with medications in their system. Respondent further argues that the Commission essentially took this notice into account as it elected to assess reduced penalties on Petitioners. Absent such leniency, the minimum guidelines would have imposed a suspension of 14,780 days on Petitioner Vafiades, 8,210 days on Petitioner Bickmore, and 545 days on Petitioner Campbell. (Ex. 455.) Respondent further argues that whether the violations are considered a first offense with a series of second and subsequent offenses or simply a series of first offenses, the sanctions imposed by the Commission were well within its discretion under the applicable rule. The Commission considered the equities of the matter, including the delayed issuing of notices, and came up with a fair result.

The Due Process Clause of the Constitution prohibits deprivations of life, liberty, or property without fundamental fairness through governmental conduct that offends the community's sense of justice, decency and fair play. *State v. McConkie*, 2000 ME 158, ¶ 9, 755 A.2d 1075. "When personal liberty and property interests are involved the Commission must comply with recognized standards of due process and fundamental fairness." *Berry v. Maine Public Utilities Comm'n.*, 394 A.2d 790, 793 (Me. 1978).

---

[3] Specifically, Petitioner Vafiades was found to have violated the rule against cobalt in a race on May 16, 2015 and Petitioner Bickmore did the same on May 9 and May 16, 2015. (P. 32; Ex. 444.)

27

Property interests are created by state law or other rules that secure interests. *See Carroll F. Look Constr. Co. v. Town of Beals*, 2002 ME 128, ¶ 11, 802 A.2d 994. The holder of a professional license has a property interest in the license that cannot be revoked without complying with the dictates of due process. *N. Atl. Sec., LLC v. Office of Sec.*, 2014 ME 67, ¶ 40, 92 A.3d 335.

Due process is a flexible concept calling for "such procedural protections as the particular situation demands." *In re Kristy Y.*, 2000 ME 98, ¶ 6, 752 A.2d 166 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 1976)). The United States Supreme Court has set forth three factors to assess whether the state violated an individual's right to due process:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and administrative burdens that the additional or substitute procedural requirement would entail.

*Balian v. Board of Licensure in Medicine*, 1999 ME 8, ¶ 10, 722 A.2d 364, 367 (quoting *Mathews v. Eldridge*, 424 U.S. at 335).

Here, as discussed above, Petitioners received fair notice that the presence of cobalt in excess of a concentration at which the substance could occur naturally was prohibited in racing horses. The court has yet to address, however, whether Petitioners Due Process Rights were violated by the imposition of heightened penalties for subsequent violations after the Commission first received positive test results on May 4, 2015. The Commission's Rules provide for the imposition of heightened penalties when subsequent offenses occur within a 36 month period. 01-17 C.M.R. ch. 17, §6 (2014). The Commission's Rules further provide that "[w]henever there is a test sample indicating the presence of a prohibited substance in violation of these rules:

B.     In the case of a post-race test, the Commission Chemist shall immediately notify the Department. Upon notification the Department shall:

(1)     Notify the trainer of the laboratory findings.

(2)     Advise the trainer of their right to have a split sample, if any, shipped and tested, at their expense, to a laboratory approved by the Department . The trainer must make such a written request to the Department within seventy-two hours of receiving notification of the primary testing laboratory's findings.

(3)     Ship the split sample in accordance with procedures developed by the Department to maintain the efficacy of the sample and chain of custody to the designated approved laboratory within seventy-two hours of receiving the request.

(4)     Bring this matter before the Commission for hearing at the earliest

01-17 C.M.R. ch. 11, § 1(7).

While this rule evidences an intent to promptly provide trainers with notice of a test sample indicating the present of a prohibited substance, it does not set forth any explicit timeline. More importantly, it does not touch on the effect of sending samples back for subsequent testing by the Department or Commission Chemist. Here, that appears to be precisely what happened. The record indicates that after receipt on May 4, 2015, the first group of blood samples was sent for a second round of testing on May 15, 2015 and a third on May 27, 2015. (*See* Ex. 444.) While the parties have not raised any arguments addressing why subsequent tests were performed, the results show a marked difference between the results in the first round as compared to those in the second and third. (*Id.*)

Given the lack of evidence and argument demonstrating that the second and third rounds of testing were improper, Petitioners have not met their burden of proof to demonstrate that their Due Process Rights were violated by the Commission's failure to

29

provide notice immediately after receiving the test results on May 4, 2015. Absent such evidence, Petitioners cannot demonstrate that their Due Process Rights were violated because the third round of test results was not received until May 27, 2015, and Petitioners' latest violations occurred on May 16, 2015.

## IV. Conclusion

For the reasons discussed above, the Court denies Petitioners' M.R. Civ. P. 80C Appeal and affirms the April 26, 2016 Decision of the Commission.

Pursuant to M.R. Civ. P. 79(a), the Clerk is directed to incorporate this Order by reference in the docket.

Dated: March 8, 2017

Lance Walker, Justice
Maine Superior Court

30

STATE OF MAINE
CUMBERLAND, SS.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CUMSC-AP-16-21

STEVEN VAFIADES,
RANDY BICKMORE, AND
W. DREW CAMPBELL,

        Petitioners

v.

MAINE STATE HARNESS RACING
COMMISSION,

        Respondent

)
)
)
)
)
)
)
)
)
)
)
)
)
)

STATE OF MAINE
Cumberland. ss. Clerk's Office

JUN 09 2016

RECEIVED

ORDER ON MOTION TO STAY

Petitioners have filed an appeal for review of the Decision and Order (hereafter "Decision") of the Maine Harness Racing Commission (hereafter the "Commission"), dated April 26, 2016. The Decision suspended Petitioners' racing licenses, prohibit them from engaging in any horse racing activities in the State of Maine for between 270 and 450 days and imposed financial penalties and required forfeitures of purses.

Presently before the Court is Petitioners' motion to stay the Decision pending final resolution of their appeal, in keeping with M.R. Civ. P. 80C(b) and 5 M.R.S. § 11004. After careful consideration of the arguments advanced by the parties in their papers and orally before the Court on June 7, 2016, the motion is GRANTED.

## I.    BACKGROUND

Petitioners are Maine residents who have over the course of decades engaged in horse racing in Maine and throughout New England. During that time they have participated in the sport as owners, trainers and drivers of harness horses. The Maine Department of Agriculture,

1

Conservation and Forestry (hereafter the "Department") alleged and the Commission after hearing concluded that Petitioners raced their horses with elevated levels of the naturally occurring element, cobalt, in their blood. The Commission concluded that cobalt is a "prohibited substance." In arriving at its conclusion the Commission applied Commission Rule, Chapter 11, Section 4, sub-section 4, which provides as follows:

> *A substance shall not be present in a horse in excess of a concentration at which the substance would occur naturally if it affects the performance of the horse.*

Petitioners contend that the administrative record before the Commission lacked competent and substantial evidence upon which to arrive at its conclusion. *See, e.g. Sinclair Builders, Inc. v. Unemployment Ins. Comm'n*, 2013 ME 76, 9, 73 A.3d 1061. Specifically, Petitioners argue that all of the experts agreed that no scientific study has been performed regarding the performance-enhancing effects of cobalt in horses. The Respondent's concede that all of the expert witnesses agreed that there has not been a scientific study regarding cobalt levels as it relates to enhanced performance in horses. However, Respondent urges, that while no scientific study supporting the Commission's conclusion has ever been conducted, two experts, Dr. Fenger and Dr. Matzkin, testified as to the "science" generally describing the physiological effects of cobalt as increasing red blood cell counts and helping mitigate the effects of "tying up," a muscle cramping problem. As such, the Commission concluded that the presence of cobalt was "performance enhancing."

The relative uncertainty regarding the use of cobalt was placed in further relief by the Commission's early conclusion regarding the penalty class to be used in this case. Initially, the Commission concluded, "Cobalt's potential to influence performance is high." Ultimately the Commission concluded that cobalt should be included in the class 3 schedule which includes

2

substances described as having a therapeutic indication in the horse and which have a "low potential to influence performance."

## II.   ANALYSIS

The court is guided by 5 M.R.S. §11004, which sets out the requisite elements of a successful motion to stay of final agency action. A stay may issue only if Petitioner can demonstrate all of the following:

1.   Irreparable injury to the petitioner;

2.   no substantial harm to adverse parties or the general public; and

3.   a strong likelihood of success on the merits.

5 M.R.S. §11004.

The Court is satisfied that the Petitioners will suffer irreparable harm. The penalties imposed are substantial, including license suspensions ranging from 270 to 450 days, fines in the thousands of dollars and repayment of all purses that Petitioners have won in affected races. While Respondent calls into question the amount of income that the Petitioners will lose, it is undisputed for purposes of the present motion that the amount is substantial and likely to cause a significant disruption to their personal and professional lives. Respondent refers the Court to the Department of Labor statistics for comparable income producing jobs, such as roofing and painting. This point is of no moment to the Court's analysis.

A stay of the discipline imposed on the Petitioners while the underlying appeal is resolved does not present substantial harm either to the parties or to the general public. The Court accepts the representation by counsel for the Petitioners that the participants in local harness racing are now properly on notice regarding the use of cobalt. The Court perceives no harm to the public or the parties as a result.

3

The Petitioners have demonstrated a likelihood of success on the merits. Petitioners raise several issues on appeal but offer only one to support the motion to stay; to wit, that the Commission concluded that cobalt affected the performance of horses without any competent record evidence to do so. It is true that the Court does not weigh the relative merits of competing experts' testimony but rather determines whether there was competent and substantial record evidence on the whole for the Commission to have concluded as it did. The record is not sufficiently clear for the Court to conclude in the affirmative.

The Commission found that "Cobalt at a level of 50 parts per billion is in excess of the concentration at which the substance would occur naturally."[1] The Commission also concluded "Cobalt is performance enhancing." The Commission bottomed the latter conclusion on the testimony of Dr. Fenger and Dr. Matzkin. Dr. Matzkin's opinion essentially was that cobalt was being administered to horses to increase the red blood cell count, which in turn could make the carrying of oxygen to the muscles more efficient. This observation by Dr. Matzkin was based upon what he was hearing around the track not whether it in fact was increasing the red blood cell count, and if so, at what quantum of cobalt measured in the blood beyond that which is naturally occurring did it have a performance effect, if any. Dr. Matzkin testified that cobalt is performance enhancing in other species but that there have been no studies to demonstrate its effect in horses. When asked if she considered cobalt supplements to a racehorse to be a performance enhancing substance, Dr. Fenger replied, "no." *Fenger* Tr. 230, lines 9-12.

The record reflects a study funded by the USTA the purpose of which is to establish a dose response curve regarding cobalt in horses. *Fenger*, T. 123, p. 226, line 11-24. This

---

[1] This threshold apparently was adopted from the RCI article but was not the basis for any expert testimony in the case, and was not identified as such in the various iterations of the Department's expert witness designations.

suggests a subtlety in the record, which appears to be lacking, but which is significant. The rule proscribes a substance in amounts greater than that which occurs naturally and which affects performance. These are separate inquiries. Merely because the first part of the rule is answered in the affirmative, does not lead to an affirmative response to the second part of the rule. The record is not clear that there was competent evidence before the Commission to demonstrate that cobalt measurements in the blood resulted in physiological changes, which in turn were "performance enhancing" or had the potential to be "performance enhancing." The Court is mindful that conflicting competent evidence is not enough to demonstrate a lack of competent evidence. However, when the evidence upon which the fact finder expressly relied does not appear to support the conclusion it reached, the Court cannot ignore this paucity in its appellate capacity even in light of the deference the Court properly affords the agency.

As an independent but related basis for granting Petitioners' motion to stay, the Court is troubled by what appears to be a dubious notification to licensees regarding the testing for cobalt and the timing and use of the ARCI report relative to the enforcement action taken against the Petitioners. The Court eagerly looks forward to the parties' submissions regarding these issues as the case unfolds. At this point it is enough to simply observe that basic notions of due process apply to state agencies with the same solemnity as they do in our courts. It is unclear to the Court why the promulgation of a rule after notice and hearing on the issue of the use of cobalt in horses was not explored in lieu of an enforcement action regarding such a complex issue that is as yet unsupported by any reliable data. The Commission is responsible in the first instance for enforcing its own rules. However, this particular rule requires a rather complex analysis of whether and in what amounts cobalt enhances performance, which requires evidence of equal qualitative value. Absent evidence that is equal to the rigor required by the rule, the Commission

5

may wish to exercise its rule-making authority for the salutary benefit it seeks to advance, which also may provide greater predictability and transparency to the licensees. For now, the potential procedural infirmities are sufficient for the Court to grant Petitioners' motion to stay.

## III.    CONCLUSION

Based on the foregoing, Petitioners' motion to stay is granted.

The Clerk is directed to enter this Order on the civil docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Date:    June 8, 2016

Lance E. Walker
Justice, Superior Court

6